UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOUIS NEWELL, an individual, for himself and those similarly situated, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>ENSIGN UNITED STATES DRILLING (CALIFORNIA) INC., a California corporation,<br><br>Defendant. | Case No.: 1:19-cv-01314-NONE-JLT<br><br>FINDINGS AND RECOMMENDATION GRANTING PLAINTIFFS' MOTION FOR CONDITIONAL CERTIFICATION OF PART OF THE CASE AND FACILITATED NOTICE TO PUTATIVE COLLECTION MEMBERS<br><br>(Doc. 19) |

This matter is before the court on Plaintiffs' motion for conditional certification and facilitated notice under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 216(b). (Doc. 19.) Defendant filed an opposition on April 17, 2020. (Doc. 21.) Plaintiffs filed a reply on April 24, 2020. (Doc. 22.) According to General Orders 612 and 617, the Court did not hold a hearing on this matter and took the motion under submission without oral argument. For the reasons discussed below, the Court recommends that the motion be granted.

**I.     Procedural History**

Plaintiff Newell filed the initial complaint on June 22, 2015. (Doc. 19 at 6.) On August 3, 2015, following the expiration of the required statutory notice period set forth in *Labor Code* § 2698 *et seq*, Plaintiff filed a first amended complaint adding an additional cause of action pursuant to the

1

1 | California Private Attorneys General Act. (*Id*.)

2 | In the first amended complaint, Plaintiff alleges claims for: (i), minimum wage violations, (ii) unfair competition, (iii) failure to pay timely wages, (iv) failure to provide lawful meal periods, (v) failure to pay overtime and doubletime, (vi) pay stub violations (California Labor Code § 226) and (vii) violation of the PAGA. (*Id*.) Each of these claims arise out of the mandated requirement that employees remain unpaid on the offshore platforms. (*Id*.)

Following discovery, on October 25, 2016, the parties stipulated to certification of the following class for purposes of bringing cross-motions for summary adjudication: "Defendant's non-exempt employees that worked and stayed on oil platforms located in federal waters off the California coast for periods of 24 hours or more, to the extent such employees' state wage and hour claims arise from or relate to this fact ('MSA Class')." (Doc. 19 at 7.) Here, that same MSA Class was and is coextensive with the putative class defined in this matter, and the class members received notice of the aforementioned certification. (*Id*.) The parties agreed that summary adjudication of Defendant's preemption affirmative defense was extremely significant in the case – *i.e.*, it was important enough to further the interest of judicial economy by decreasing trial time and/or significantly increase the likelihood of settlement, as discussed in *Cal. Civ. Proc. Code* § 437c, subd. (t). (*Id*.) The state court ordered the class certified for this limited purpose two days later, and a class notice was mailed. (*Id*.) There were no opt-outs. (*Id*.) Thereafter, on or about April 28, 2017, Defendant filed its motion for summary adjudication of its affirmative defense of "Preemption," asserting that California law was/is inapplicable to the subject offshore oil rigs. (*Id*.)

On August 15, 2017, the parties filed a stipulation regarding adjustments to motion for summary adjudication hearing schedule, alerting the Court of a pending appeal before the Ninth Circuit Court of Appeals (*Newton v. Parker Drilling Mgmt. Servs., Inc*. (C.D. Cal. Aug 10, 2015) No. 2:15-cv-02517 ("*Newton*")), a decision in which addressed the identical issues raised in the Defendant's MSA. (*Id*.) The stipulation requested that the Court vacate the MSA hearing date until after the Ninth Circuit Court of Appeals rendered its decision in *Newton*. (*Id*.) On or about February 5, 2018, the Ninth Circuit rendered its opinion in *Newton*, holding that California labor law was and is indeed "applicable" to the work performed by the MSA Class and "not inconsistent" with federal law.

(*Id.*) The Court thus held that California state wage and hour laws are adopted as surrogate federal law on the offshore platforms. (*Id.*)

Thereafter, following supplemental briefing regarding the *Newton* decision, Defendant moved for a stay. (*Id.*) This motion for stay was denied on May 21, 2018. (*Id.*) Thereafter, on June 15, 2018, after considering all of the briefing, and oral argument, the Court denied Defendant's MSA, holding that California law is not preempted by federal law for offshore platforms on California's Outer Continental Shelf. (Doc. 19 at 7-8.) Defendant's oral request at the hearing for a stay was also denied. (Doc. 19 at 8.)

Subsequently, Defendant filed a writ petition with the Fifth District, which was later denied by the appellate court. (*Id.*) Thereafter, Defendant filed a writ petition to the California Supreme Court, which was also denied on or about December 12, 2018. (*Id.*)

On February 1, 2019, the Court granted Defendant's renewed motion to stay all further proceedings, pending a final decision by the United States Supreme Court in *Parker Drilling Management Services, LTD v. Brian Newton* ("*Newton*"), Sup. Ct. Case No. 18-389, including Plaintiff's then-pending motion for class certification, and tolling the five-year statutory requirement for prosecuting a case under Code of Civil Procedure section 583.310. (*Id.*)

In June 2019, the United States Supreme Court issued its written opinion in the matter of *Parker Drilling* (Sup. Ct. Case No. 18-389; argued, April 16, 2019; decided, June 10, 2019; judgment issued, July 12, 2019), reversing the Ninth Circuit and holding that where federal law addresses the relevant issue, state law is not adopted as surrogate federal law on the Outer Continental Shelf. (*Id.*)

In light of the Supreme Court's direction that federal law, not state law, should be applied on the Outer Continental Shelf, Plaintiff and Defendant stipulated that Plaintiffs would amend the complaint to assert an overtime claim under the FLSA and a rest break claim under California law, among other clarifications of the pleadings in light of the Supreme Court's ruling in *Parker Drilling*. (*Id.*) Thus, on August 6, 2019 the parties stipulated, and Plaintiff's second amended complaint was filed on or about August 22, 2019, which Defendant answered on or about September 18, 2019. (*Id.*) Thereafter, Defendant removed the action to federal court, and the parties again stipulated to the filing of the Plaintiffs' third amended complaint in this matter. (*Id.*)

## II. Factual Background

Plaintiff Louis Newell worked for the Defendant from approximately April of 2010 through December of 2014. (Doc. 19 at 8.) He worked as a "rig hand" for Defendant on various offshore platforms, off of the coast of California, during that time frame. (Doc. 19 at 8-9.) He typically worked hitches[1] that were seven days in length. (Doc. 19 at 9.) Plaintiff Miguel Calderon similarly worked for Defendant from at least the beginning of the claim period through approximately mid-January of 2020. (*Id.*) He also worked in various nonexempt positions for Defendant on California offshore platforms. (*Id.*)

During the Plaintiffs' employment, for a typical hitch they were assigned to be on "active duty" for a shift of approximately 12.5 to 13.5 hours per day, in addition to time spent traveling to and from the State of California mainland at the beginning and end of each hitch. (*Id.*; Doc. 21 at 11.) In the drilling oil and gas industry, this on-duty time is generally called a "tour" (pronounced, "tower"). (*Id.*)

During the claims period, for a typical hitch or period of consecutive shifts, each tour was followed by approximately 10.5 to 11.5 hours per day, less travel time, which Defendant deems "off duty time." (Doc. 19 at 9.) Plaintiffs ordinarily referred to this time as "controlled standby time." (*Id.*) During such time, MSA Class members could engage in "off-duty" activities aboard the offshore platforms, including, among other activities, sleeping, eating, working out, and watching television. (*Id.*) Plaintiffs ordinarily would spend their controlled standby time sleeping, or waiting for his next period of active duty. (*Id.*)

As such, during his hitches, Plaintiffs ordinarily would work approximately 12.5 hours on "active duty" and then spend 11.5 hours on "controlled standby," each day. (*Id.*) This cycle would repeat daily, until the hitch concluded and Plaintiffs would ride to the mainland by boat or helicopter. (*Id.*; Doc. 21 at 11.) Otherwise, employees were transported back to shore after each shift during the hitch, which is colloquially referred to as "day tripping." (Doc. 21 at 11.)

---

[1] The days involving scheduled consecutive work shifts by collection members during the claims period are referred to colloquially as a "hitch" in the oil and gas industry. (Doc. 19 at 9; Doc. 21 at 11.) The collection members were typically scheduled to work one shift each day during a seven-day hitch, followed by seven consecutive days off. (*Id.*)

4

Beginning in 2017, for certain platforms, Calderon and other offshore employees were also informed in writing about the nature of their offshore work assignment through "Live Aboard Agreements." (Doc. 21 at 12.) For hitches spent offshore on certain platforms, Calderon and other employees signed Live Aboard Agreements, acknowledging they were not required to live aboard the platform "as part of [their] work;" that they were free to leave the platform at the end of a shift; but if employees opted to return to shore when offshore lodging was provided, Defendant did not provide additional lodging onshore or reimbursements. (*Id*.)

As part of Defendant's hiring process and throughout their employment, Newell and Calderon were informed of how much they would be paid and the method of compensation—in the form of hourly wage rates. (*Id*.) When each was hired, he was informed in writing he would be paid an hourly rate. (Doc. 21 at 12-13.) During their employment, Plaintiffs signed "Personnel Action Forms" to inform them of changes to the "type of pay" and "rate of pay." (Doc. 21 at 13.) Defendant reports that though Plaintiffs' hourly rates of pay periodically changed during their employment, those hourly rates did not change each time Plaintiffs day tripped or lived aboard offshore platforms. (*Id*.)

During the employment, after Plaintiffs would clock out of being on "active duty," they typically would eat dinner, shower, and return to quarters. (Doc. 19 at 9.) Though they were not on the clock during this time, Plaintiffs nevertheless were subject to being (and were actually) interrupted at any time, for any alarms that might sound. (*Id*.) These alarms have included such issues as: combustible gas alarms (*e.g.*, H2S) or SO2 alarms, LEL alarms, platform shutdowns, and mechanical failures. (Doc. 19 at 9-10.) Less common alarms would have included spills or fires. (Doc. 19 at 10.) These alarms, calls, and other issues requiring Plaintiffs to report to duty, were more frequent depending on how much drilling activity was going on during a hitch. (*Id*.)

At all times during Plaintiffs' approximately 12 hours of controlled standby/on-call time each day, Plaintiffs had to remain on the oil platform. (*Id*.) During the employment with Defendant, they could not return to shore, barring a life and death emergency or injury. (*Id*.) During this time, Plaintiffs were always required to be "on call" and available to respond to issues that would arise. (*Id*.)

When Plaintiffs were employed by Defendant, they were never permitted to be off-duty during meal periods, as Plaintiffs always remained on-call and subject to being interrupted during each active

5

duty tour. (*Id*.) Plaintiffs also could not leave the platforms for meal periods. (*Id*.) When Plaintiffs' meal periods were interrupted due to an emergency, Plaintiffs had to drop whatever they were doing and respond to the call. (*Id*.)

During the employment, Plaintiffs were paid hourly. (*Id*.) Plaintiffs' typical tour would involve an approximately 12.5 hour period of active duty. (*Id*.) Plaintiffs would sometimes be paid for time spent responding to drills or alarms or emergencies during their controlled standby/on-call hours each day, but this was not always the case. (*Id*.) Sometimes, if an alarm or callout resulted in a safety meeting or other response less than 30 minutes, Plaintiffs would return to their quarters but did not receive any pay for that time responding to the call. (*Id*.) At all times during the employment, Plaintiffs were not ever paid for time they spent sleeping on the platforms or time that was otherwise part of their periods of controlled standby. (*Id*.)

The paycheck stubs provided to Plaintiffs do not show that they received compensation for all hours they spent on the assigned platforms, and they do not show that either received meal or rest period premium pay. (*Id*.; *see* Doc. 21 at 13.)

Plaintiffs report that the Defendant has stipulated to the common issues of fact in this case. (Doc. 19 at 11.) It is undisputed herein that the collection members all performed non-exempt rig work for Defendant on offshore platforms. (*Id*.) It is further undisputed that the collection members spent the duration of each hitch on the platforms. (*Id*.) Other than the travel to and from the offshore platforms, the periods of consecutive shifts were spent on the platforms. (*Id*.) Defendant and Plaintiffs also agree that collection members were not paid for time on the platforms which Defendant considered "off duty." (*Id*.)

In addition, it is stipulated in this action that during the relevant period, when collection members resided aboard the platforms affixed to the Outer Continental Shelf during their hitches / periods of consecutive shifts, collection members were provided lodging and common areas for personal use, as well as meals. (*Id*.) The offshore lodging and meals were provided at no-cost to collection members. (*Id*.) During the relevant period, the value of the lodging and meals provided to the collection members while offshore was not included in the regular rate calculation for purposes of payment of overtime or doubletime wages to the collection members. (*Id*.) That is, Defendant's policy

and practice during the relevant period was to calculate the regular rate of pay for purposes of payment of overtime and double time wages based on monetary wages and exclude from that calculation the value of lodging and meals provided when collection members spent their hitches offshore. (*Id.*)

Depositions of the entity have confirmed the common, classwide practices in effect during the relevant period. (*Id.*) Defendant produced two witnesses regarding the collection in this matter, Don Fogle (regarding the practices applicable to Rig 608) and Lee Ramsey (regarding the practices applicable to Rig 607). (*Id.*) Together, Rig 607 and Rig 608 comprise the drilling equipment and operations which encompass the putative collection members in this matter; these two rigs have operated from various platforms during the collection period. (*Id.*)

Don Fogle testified that the standard practice for all collection members working on Rig 608 was a "hitch." (Doc. 19 at 12.) A "hitch" is an employee working twelve hours on and twelve hours off and working seven days on, seven days off. (*Id.*) When collection members are on a hitch, they remain on the platform unless there is an emergency (*e.g.,* limb chopped off, acute medical situation). (*Id.*) Other than that, the general rule is that collection members remain on the platform for the duration of the hitch. (*Id.*) Mr. Fogle was unaware of any collection member who did not follow the general rule: that collection members remain on the platform during their hitch. (*Id.*)

Mr. Fogle testified that collection members cannot leave the rig for meal breaks. (*Id.*) He admitted that during meal breaks, crew members are expected to respond and attend to calls and alarms. (*Id.*) Mr. Fogle agreed that collection members are not relieved of their duties during their meal breaks. (*Id.*)

Lee Wayne Ramsey testified identically to Mr. Fogle, but with regard to Rig 607 practices. (*Id.*) Once the crew starts their seven-day hitch, they are expected to remain on the platform barring an emergency. (*Id.*) As to Rig 607, all of the collection members lived on board. (*Id.*) Mr. Ramsey related that collection members were never paid for their off-duty time, unless there was an H2S alarm. (*Id.*) Even though employees cannot leave during their off-duty time, they are not paid for that time, and that practice of non-payment has applied for the past five years. (*Id.*)

With regard to meal periods, Mr. Ramsey agreed that collection members were not permitted to leave the platform for lunch. (*Id.*) He also agreed that during meal breaks, employees have a duty to respond to critical issues. (*Id.*)

Defendant has conceded that from June 22, 2011 through November 5, 2015, there were 179 persons in the collection. (*Id.*) As part of the MSA class, and as of January 27, 2017, there were 213 members in the certified class. (Doc. 19 at 13.)

The collection in this matter has been defined as: "All non-exempt employees of Ensign United States Drilling (California) Inc. who, at any time between June 22, 2011 and the present (the "Claims Period"), worked and stayed on oil platforms off of the California coast for periods of 24 consecutive hours or more any time during the Claims Period." (*Id.*)

Earl Shank, an Ensign Rig Manager, provided a declaration explaining that, as to Rig 607 employees (and without disparate treatment of any single employee), lodging was provided to Ensign employees and they "were not charged for their accommodations [because] lodging was paid for by DCOR[, one of Ensign's clients, which operates various off-shore platforms,] as specified in its contract with Ensign." (*Id.*; Doc. 19-4 at 166-67.) Defendant notes, "[f]or Rig 607 crew members, DCOR provided for crew member's housing in one of two ways: through on-platform living accommodations or through hotels on shore." (*Id.*) Notably, Mr. Shank describes a uniform policy and practice of providing paid-for accommodation. (*Id.*) Mr. Shank also states, "When interviewing prospective crew members for Rig 607, Lee Ramsey, other rig managers, and I had a uniform practice of discussing the nature of the assignment, including the fact that living accommodations were typically provided by DCOR on platforms." (Doc. 19 at 14.)

Donald Fogle confirmed the same for Rig 608 workers. (*Id.*) Fogle states that "[i]t is correct that it is my practice to ensure that workers being assigned to Rig 608 are aware of and agree to the fact that lodging during their hitch will be provided on-platform, rather than at a hotel onshore." (*Id.*)

Another of Defendant's managers, Rick Ordonez, confirmed the common practice of providing and paying for lodging, stating that, "As part of this hiring process, it was my standard practice, and that of other Rig Managers, to make it clear that Rig 608 crew members were expected to remain on

8

Platform Irene throughout the hitch. I would typically explain that lodging is provided by Freeport on-platform at no cost to the employee…" (*Id.*)

### III. Legal Standard

Pursuant to FLSA, an employee may file a civil action, on behalf of himself and other employees similarly situated, against an employer that fails to adhere to federal minimum wage and overtime law. 29 U.S.C. § 216(b); *see also Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 69 (2013). Unlike a class action brought under Federal Rule of Civil Procedure 23, similarly situated employees can join a FLSA collective action only if they opt-in by giving written consent to be joined. 29 U.S.C. § 216(b).

The FLSA does not define the term "similarly situated," and this court has identified no binding Ninth Circuit or Supreme Court authority interpreting that term. However, district courts in this circuit have used a two-step approach to decide whether potential FLSA plaintiffs are similarly situated. *See, e.g., Kellgren v. Petco Animal Supplies, Inc.*, No. 13CV644 L KSC, 2015 U.S. Dist. LEXIS 118615, 2015 WL 5167144, at *2 (S.D. Cal. Sept. 3, 2015); *Syed v. M—I, L.L.C.*, No. 1:12-cv-01718-AWI-MJS, 2014 U.S. Dist. LEXIS 165465, 2014 WL 6685966, at *2 (E.D. Cal. Nov. 26, 2014); *Troy v. Kehe Food Distribs.*, 276 F.R.D. 642, 649 (W.D. Wash. 2011); *Lewis v. Wells Fargo Co.*, 669 F. Supp. 2d 1124, 1127 (N.D. Cal. 2009); *Leuthold v. Destination Am., Inc.*, 224 F.R.D. 462, 467-68 (N.D. Cal. 2004); *Wynn v. NBC*, 234 F. Supp. 2d 1067, 1082 (C.D. Cal. 2002). In the first step, district courts may conditionally certify the proposed collection based on consideration of the parties' pleadings and affidavits. *Leuthold*, 224 F.R.D. at 467. This determination is made under a "lenient standard"— requiring a preliminary determination that notice is appropriate and that "the putative class members were together the victims of a single decision, policy, or plan." *Lewis*, 669 F. Supp. 2d at 1127 (citing *Thiessen v. GE Capital Corp.*, 267 F.3d 1095, 1102 (10th Cir. 2001)). "The sole consequence of conditional certification is the sending of court-approved written notice to employees." *Genesis Healthcare*, 569 U.S. at 75 (citing *Hoffmann—La Roche Inc. v. Sperling*, 493 U.S. 165, 171-72, 110 S. Ct. 482, 107 L. Ed. 2d 480 (1989)). District courts have the authority to facilitate notice to potential plaintiffs and may set a deadline for plaintiffs to opt in. *Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1064 (9th Cir. 2000) (citing *Hoffmann—La Roche*, 493 U.S. at

169). In the second step, after collection members have opted in and discovery has taken place, the party opposing collection certification may seek to decertify the collection. *Leuthold*, 224 F.R.D. at 467. This court need only consider the first step at this stage of the litigation.

**IV.     Discussion and Analysis**

**A.     Conditional Collective Certification**

Plaintiffs have met their burden of showing at the first step that conditional certification is warranted. At this stage in the litigation, Plaintiffs propose defining those "similarly situated" for the FLSA collective action as: "All current and former all hourly employees of Ensign United States Drilling (California) Inc., who, at any time within three years from the date of filing of this lawsuit, worked on oil platforms off of the California coast and who stayed on such platforms for periods of 24 hours or more." (Doc. 19 at 15.) Defendant has conceded that from June 22, 2011 through November 5, 2015, there were 179 persons in the collection. (Doc. 19-3 at 4, Hefelfinger Declaration, ¶ 15.) Plaintiffs contend that Defendant instituted common policies and practices related to the employment of its offshore hourly workers, inasmuch as there was no payment or regular rate adjustment provided for lodging and meals. Specifically, Plaintiffs contend that in the course of the work performed by them and the putative collection, they worked "hitches" on offshore platforms where they were required to work and live aboard for days at a time (typically, a 7-day hitch was most common), and they were provided meals and lodging as part of the consideration offered for the offshore position. (Doc. 19 at 14.) Plaintiffs allege that during the relevant period, however, Plaintiffs and their co-workers were paid by Defendant pursuant to a compensation structure that did not include the fair value of the lodging and meals as remuneration for purposes of the regular rate calculation and, as a result, have not received full and correct pay for all hours worked. (Doc. 19 at 14.) Plaintiffs contend that the objective information (pay and hours worked) is all a matter of fact and recorded in Defendant's payroll records, and the pay rates to each affected worker are purely objective (indicated on the pay stubs). (Doc. 19 at 20.) Plaintiffs allege Defendant's actions violate the FLSA in Count 8 of Plaintiffs' third amended complaint. (Doc. 19 at 15.) Therefore, any claims of the putative collective members concerning this issue are the result of a single policy. Based on these representations, the

court is satisfied and accordingly recommends granting conditional certification of the proposed collection.

Notably, as acknowledged by both Plaintiffs and Defendant, in the state court proceedings, the parties stipulated to class certification for the purpose of obtaining a legal determination of which law should apply to offshore platforms. (Doc. 21 at 14; Doc. 22 at 5; Doc. 19-4 at 105-123.) Moreover, as Plaintiffs contend in reply, the parties have stipulated to nearly all of the facts germane to the conditional certification analysis. (Doc. 22 at 5.) Plaintiffs include a list of the facts common to the entire class that the parties have already stipulated to and that Defendant has affirmed, including the FLSA-specific issues and practices relating to the meal and lodging benefits given to the class and collective. (Doc. 22 at 5-7.)

In opposition, Defendant first contends that Plaintiffs advance the wrong standard by which to evaluate conditional certification. (Doc. 21 at 17-19.) Specifically, Defendant argues that because "significant discovery has occurred," the appropriate standard is not the "'lenient' 'notice stage' standard Plaintiffs advocate, but a stricter standard that contemplates the extensive fact development that has occurred here." (Doc. 21 at 19.) Defendant appears to argue that the first step should be skipped and the second step standard should apply. (*See* Doc. 22 at 8.) Several courts have stated that the second step should take place "once discovery is complete." *Adams v. Inter-Con Sec. Sys.*, 242 F.R.D. 530, 536 (N.D. Cal. 2007); *Leuthold v. Destination Am.*, 224 F.R.D. 462, 467 (N.D. Cal. 2004). Other courts state that the second step motion "is made after discovery is largely complete." *Wynn v. NBC*, 234 F. Supp. 2d 1067, 1082 (C.D. Cal. 2002); *Pfohl v. Farmers Ins. Group*, 2004 U.S. Dist. LEXIS 6447, 2004 WL 554834, *2 (C.D. Cal. 2004). The difference between "complete" and "largely complete" is the issue. An earlier opinion of the Eastern District directly examined Defendant's argument and concluded "Courts within this circuit instead refuse to depart from the notice stage analysis prior to the close of discovery. Several courts have held that the notice stage analysis applies whenever 'discovery has not yet been completed and [the] case is not ready for trial'. Other courts have held that the notice stage analysis applies at least when discovery pertinent to collective certification is outstanding. . . . Skipping to the second stage not only requires the court to evaluate an incomplete (although potentially substantial) factual record-it interferes with the future

11

completion of that record." *Kress v. PricewaterhouseCoopers, LLP*, 263 F.R.D. 623, 629 (E.D. Cal. 2009), citations omitted. The first step standard should be used until discovery is complete. *Syed v. M-I, L.L.C.*, 2014 U.S. Dist. LEXIS 165465, *6 (E.D. Cal. 2014).

Even assuming that "largely complete" is the correct threshold, Defendant has not shown that discovery has reached that stage. As Plaintiffs state in reply, "[t]here has not yet been any discovery completed regarding the recently-added FLSA claim." (Doc. 22 at 8.) Defendant also acknowledges that "the FLSA claim is new to this action" in its opposition. (Doc. 21 at 18.) Additionally, the Court's scheduling order permits class certification discovery to be conducted through December 14, 2020. (Doc. 10 at 2-3.) Of note, the parties stipulated to extend certain discovery, hearing, and filing deadlines until after a rescheduled mediation (on September 18, 2020), discussing unforeseen delays caused by the COVID-19 pandemic and related impacts. (Doc. 23.) This suggests that the parties themselves recognized that discovery would be incomplete in a manner such that a second stage analysis would be premature. The first stage standard for class certification is appropriate at this juncture.

Defendant also argues that Plaintiffs failed to meet their burden for conditional certification because Plaintiffs cannot demonstrate that Defendant violated the FLSA, and Plaintiffs failed to offer any evidence in support of their FLSA claims and that they were similarly situated in how they regarded offshore room and board. (Doc. 21 at 19-29.) In reply, Plaintiffs contend that Defendant is attempting to hold Plaintiffs to an incorrect standard for FLSA conditional certification. (Doc. 22 at 8.) Specifically, Plaintiffs argue that they are not required to prove their FLSA case in chief at this phase of the process. (Doc. 22 at 8-10.) Plaintiffs assert that they have shown what they need to for conditional certification, stating that Plaintiffs allegations, together with the stipulated fact that Defendant has excluded the value of lodging and meals provided from its regular rate calculations, meets the standard. (Doc. 22 at 10.)

Again, the determination to conditionally certify the proposed collection is made under a "lenient standard" requiring a preliminary determination that "the putative class members were together the victims of a single decision, policy, or plan." *Lewis*, 669 F. Supp. 2d at 1127. Plaintiffs are not required at this phase to prove that Defendant violated the FLSA. Also, Defendant's contention

that Plaintiffs fail to offer any evidence in support of their FLSA claims or that they were similarly situated in how they regarded offshore room and board are simply incorrect, as set forth above. Specifically, Plaintiffs have alleged that Defendant did not pay Plaintiffs and those similarly-situated hourly offshore workers at proper overtime rates for work in excess of forty hours per workweek in violation of 29 U.S.C. §§ 201 et seq. (Doc. 19 at 16.) As Plaintiffs allege in the third amended complaint, during the employment with Defendant, Plaintiffs' offshore shifts typically lasted seven days and included at times live-aboard lodging, and meals; however, the value of the lodging and meals furnished to Plaintiffs and the collective were not added to the regular rate for purposes of overtime payment. (Doc. 19 at 16; Doc. 15 at 4, 16.) As Plaintiffs contend, the stipulated fact that Defendant has excluded the value of lodging and meals provided from its regular rate calculations, along with Plaintiffs allegations, meets this lenient standard. Plaintiffs are not required at this phase of the process to be held to the standard Defendant appears to argue here.

Defendant also argues that the FLSA claim is barred by the applicable statute of limitations and argue that equitable tolling is not appropriate. (Doc. 21 at 29-31.) However, as Plaintiffs argue in reply, the FLSA claim relates back to the filing of the original complaint in this matter. (Doc. 22 at 10-11.) Specifically, Plaintiffs assert that the FLSA regular rate claim asserted by the Plaintiffs, after the U.S. Supreme Court held that federal law must be applied, "arises out of" the very same conduct, transaction and occurrences set out in the original wage and hour complaint filed in the Kern County Superior Court. (Doc. 22 at 11.) Plaintiffs cite to *Newton v. Parker Drilling* (C.D. Cal. Case No. 2:15-CV-02517-RGK), as an example, which contained the same issues as this case. (Doc. 22 at 11.) Plaintiffs cite that in that case, upon remand from the Supreme Court to decide the choice-of law issues, the Central District found that the Newton plaintiff's newly added FLSA claims related back to the original pleading. (Doc. 22 at 11.)

Moreover, issues related to statute of limitations and employment periods are more appropriately considered at the second stage on a complete record and not as a basis to deny conditional certification. *Davis v. Soc. Serv. Coordinators*, 2012 U.S. Dist. LEXIS 122315, *71-72 (E.D. Cal. 2012). Issues regarding statute of limitations and employment periods are largely related to individual calculations of damages, not to whether there is a similar theory of liability. *Id*. These

individualized issues do not preclude notice certification at the first stage. *See Graham v. Overland Solutions, Inc.*, No. 10-cv-672-SEN (BLM), 2011 U.S. Dist. LEXIS 49308, 2011 WL 1769737, at *2-3 (S.D. Cal. May 9, 2011) (disparate factual settings of the individual plaintiffs better resolved at the stricter second-stage on a complete record). Defendant will have an opportunity to raise these arguments again at the second stage of the FLSA certification process.

**B.     Facilitated Notice**

**1.     Notice to Potential Collection Members**

Plaintiffs ask the Court to approve the notice to be provided and includes a draft collective action notice. (*See* Doc. 19-5.) Defendant acknowledges that a collective action notice should be sent if a collective is certified, but objects to Plaintiffs' draft notice on several grounds. (Doc. 21 at 31-33.)

Defendant first argues that the notice fails to include information regarding offsets due to Defendant's payment of double time wages and the potential tax treatment of lodging and meals as "income." (Doc. 21 at 31-32.) However, as Plaintiffs contend in reply, Defendant provides no case law holding that such detailed tax "advice" must be provided in an initial notice. (Doc. 22 at 11.) Plaintiffs correctly assert that such a nuanced detail is not appropriate for inclusion in the notice and that no party "is yet in a position to opine regarding the tax treatment of any potential recovery in this matter." (Doc. 22 at 11.)

Defendant also contends that employees who are subject to arbitration agreements may be barred from participating in the collective action. (Doc. 21 at 32-33.) However, as Plaintiffs argue in reply, the arbitration agreements provided with Defendant's opposition reveal that this action is explicitly "carved out" from the coverage, since this class action litigation pre-dates the agreements. (Doc. 22 at 12; Doc. 21-1 at 21-22, 24-25.)

Defendant further argues that the proposed notice fails to include collection member responsibilities if they were to opt in, such as the possibility of litigation fees. (Doc. 21 at 10, 33.) In *Gomez v. H & R Gunlund Ranches, Inc.*, 2010 U.S. Dist. LEXIS 137736, at *31-32 (E.D. Cal. 2010), this Court looked to other circuit cases regarding such an issue, which held that the notices need not contain cost-shifting language. The Court discussed that the inclusion of such cost-shifting language would unreasonably chill participation in the action by potential collection members, and potential

collection members interested in retaining the services of plaintiffs' counsel will undoubtedly inquire on their own. *Id*. Thus, Plaintiffs' need not include such language in the notice as to avoid any chilling effect on participation in the action. The notice provides collection members Plaintiffs' attorneys' contact information should they wish to inquire about his/her potential exposure in joining the collection.

Lastly, Defendant alleges that any notice should be administered by a neutral third-party. (Doc. 21 at 33.) Plaintiffs state in their reply that they are amenable to utilizing the same third-party administrator that has been used in this case, CPT Group Inc. (Doc. 22 at 12.) Accordingly, the Court recommends that CPT Group, Inc. serve as a neutral third party administrator.

The Court finds that the draft collective action notice is reasonable and adequate. The proposed form is neutral in tone, apprises putative collective members of the claims alleged, expressly denies endorsement from the Court, provides the steps they must take to be included in this action, and provides contact information for Plaintiffs' counsel. This request is reasonable and is approved.

**2. Names and Addresses**

Plaintiffs request that this Court require Defendant to provide Plaintiffs' counsel with the names, current or last known addresses, telephone numbers, e-mail addresses, dates of employment, and employee identification numbers of all employees who have been employed by Defendant from three years from the date the litigation was commenced. (Doc. 19 at 22.) Plaintiffs also request that the Court require Defendant to e-mail the notice to the FLSA putative collection members and to post it within all of the locations in conspicuous locations, in the same areas in which it is required to post other employee notices and postings. (Doc. 19 at 22.)

This Court has the authority to require disclosure of such information as the names and last known addresses of collection members. *Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. at 170-171, 110 S.Ct. 482 ("Section 216(b)'s affirmative permission for employees to proceed on behalf of those similarly situated must grant the court the requisite procedural authority to manage the process of joining multiple parties in a manner that is orderly, sensible, and not otherwise contrary to statutory commands or the provisions of the Federal Rules of Civil Procedure." ) Pursuant to *Hoffmann-LaRoche Inc. v. Sperling,* the Court has discretion and "a managerial responsibility to oversee the

joinder of additional parties to assure that the task is accomplished in an efficient and proper way." *Id.* at 170-171, 110 S.Ct. 482.

Defendant does not object in its opposition to providing the names, addresses, telephone numbers, e-mail addresses, dates of employment, and employee identification numbers. Accordingly, Defendant shall provide same within thirty days of the Court adopting this findings and recommendation. In addition, Defendant does not object to Plaintiffs' request that Defendant be required to e-mail and post the notice, and the Court finds that this request is sensible and efficient to reach potential collection members (including past and current employees) given the nature of the work at issue. Defendant shall e-mail the notice to the FLSA putative collection members and post the notice in locations reasonably calculated to provide notice to current employees. Defendant shall post the notice within ten days of the Court adopting this findings and recommendation.

## V.     Recommendation

Thus, the Court RECOMMENDS as follows:

1. Plaintiffs' motion for certification of a collective action under count 8 of the third amended complaint be GRANTED;
2. CPT Group, Inc. be appointed as the neutral third-party administrator
3. Plaintiffs' motion for facilitation of notice to collection members be GRANTED, as more fully set forth in the order;
4. Within 30 days of the Court adopting this findings and recommendation, Defendant be required to provide to Plaintiffs' counsel the names, addresses, telephone numbers, e-mail addresses, dates of employment, and employee identification numbers of the putative members of the collection;

///
///
///
///
///
///

5. Within ten days of the Court adopting this findings and recommendation, Defendant be required to e-mail the notice to the FLSA putative collection members and post the notice in locations reasonably calculated to provide notice to current employees.

These Findings and Recommendations will be submitted to the United States District Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). **Within 14 days** of the date of service of these Findings and Recommendations, the parties may file written objections with the Court. The document should be captioned, "Objections to Magistrate Judge's Findings and Recommendations." Failure to file objections within the specified time may result in waiver of his rights on appeal. *Wilkerson v. Wheeler*, 772 F.3d 834, 839 (9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **April 29, 2020**               **/s/ Jennifer L. Thurston**
                                           UNITED STATES MAGISTRATE JUDGE