1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

LOUIS NEWELL, an individual, for
himself and those similarly situated;
MIGUEL CALDERON, an individual for
himself and those similarly situated,

              Plaintiffs,

    v.

ENSIGN UNITED STATES DRILLING
(CALIFORNIA) INC., a California
corporation,

              Defendant.

No.  1:19-cv-01314-NONE-JLT

ORDER GRANTING PLAINTIFFS' MOTION
FOR PRELIMINARY APPROVAL OF
CLASS ACTION SETTLEMENT

(Doc. No. 30.)

      Before the court for consideration is plaintiffs' unopposed motion for preliminary

approval of a class action settlement.  (Doc. Nos. 30, 32.)  Following the filing of the pending

motion, the court noted several concerns regarding the proposed settlement and directed the

parties to file supplemental briefing.  (Doc. No. 33.)  Thereafter, the parties filed a joint

supplemental brief on April 30, 2021.[1]  (Doc. No. 34.)  Pursuant to Local Rule 230(g) and

/////

/////

---

[1]  On July 23, 2021, the court also ordered the parties to file supplemental briefing addressing the impact of the recent Ninth Circuit decisions in *Mauia v. Petrochem Insulation, Inc.*, 5 F.4th 1068 (9th Cir. 2021) and *Newton v. Parker Drilling Mgmt. Servs., Ltd.*, 860 F. App'x 536 (9th Cir. 2021) ("*Parker Drilling*"), on the pending motion to approve the parties' proposed class action settlement.  (Doc. No. 35.)  In response, the parties filed a joint brief on August 6, 2021.  (Doc. No. 36.)

General Order No. 617, the court has taken this matter under submission on the papers without holding a hearing.  For the reasons set forth below, plaintiffs' motion will be granted.[2]

## BACKGROUND

### A.    Factual Background

Defendant conducts drilling operations on offshore oil and gas platforms off the California coast. (Doc. No. 30 at 10.)  Plaintiffs Newell and Calderon worked for defendant on federal offshore platforms, performing non-exempt rig work.  (*Id.*)  Plaintiffs' typical work schedule has consisted of a seven day "hitch" (the colloquial term for the work period spent offshore) which was generally seven consecutive days spent on the platform, followed by seven days off work. (*Id.*)  During a hitch, plaintiffs generally were scheduled to work a rotating 12-hour schedule. (*Id.*)  Plaintiffs allege that they and the putative class were scheduled for 12 hours "on duty," followed by 12 hours of "controlled standby" in which plaintiffs and the putative class members were allegedly required to be "on call" and available to respond to any issues that arise on the platform.  (*Id.*)  During a hitch, plaintiffs further allege that they and the putative class were not able to leave the platform.  (*Id.*)  Plaintiffs also allege that they and the putative class members were required to listen for and respond to calls and alarms during meal periods. (*Id.*)  If work calls or an alarm sounded, plaintiffs and putative class members were allegedly required to stop whatever they were doing and respond to the work, and they were not allowed to leave the platform for any meals.  (*Id.* at 10–11.)

Plaintiffs next allege that during the relevant period, when class members resided aboard the platforms affixed to the Outer Continental Shelf ("OCS") during their hitches, they were provided lodging and common areas for personal use and meals.  (*Id.* at 11.)  The offshore lodging and meals were provided at no cost to class members, but the value of the lodging and

---

[2]  The undersigned apologizes for the excessive delay in the issuance of this order.  This court's overwhelming caseload has been well publicized and the long-standing lack of judicial resources in this district long-ago reached crisis proportion.  That situation, which has continued unabated for over twenty-two months now, has left the undersigned presiding over 1,300 civil cases and criminal matters involving 735 defendants at last count.  Unfortunately, that situation sometimes results in the court not being able to issue orders in submitted civil matters within an acceptable period of time.  This situation is frustrating to the court, which fully realizes how incredibly frustrating it is to the parties and their counsel.

2

1    meals was not included in the regular rate calculation for purposes of payment of overtime or

2    double time wages to the class members, which means plaintiffs and class members were not

3    correctly paid.  (*Id.*)

4         Plaintiffs allege that defendant had the following common policies and practices affecting

5    the putative class:  (1) requiring employees to remain on the oil platforms for the duration of their

6    hitch; (2) only paying employees for 12 or more hours of active work time each day; (3) not

7    paying employees for approximately 12 hours of "controlled standby" time each day, whether at

8    overtime, doubletime, or minimum wage rates; (4) not having employees clock out for or receive

9    duty-free meal periods; (5) requiring employees to be ready to respond to alarms and calls during

10   "on duty" and "controlled standby" time; and (6) failing to add[3] meal and lodging benefits into

11   the regular rate of pay calculations.  (*Id.*)

12   **B.    Procedural History**

13        On June 22, 2015, plaintiffs initiated this action in the Kern County Superior Court.  (Doc.

14   No. 1-1.)  Following the expiration of the required statutory notice period set forth in California

15   Labor Code § 2698 *et seq.*, plaintiffs filed a first amended complaint on August 3, 2015, asserting

16   claims for minimum wage violations, unfair competition, failure to timely pay final wages, failure

17   to provide lawful meal periods, failure to pay overtime and double time premium wages, and pay

18   stub violations, as well as an additional cause of action brought pursuant to the California Private

19   Attorneys General Act ("PAGA").  (Doc. No. 1-2.)  Each claim arises out of the mandated

20   requirement that employees remain on the offshore platforms but went unpaid for doing so.  (*Id.*)

21   The first of three private mediation sessions occurred on January 27, 2016, in Bakersfield,

22   California.  (Doc. No. 30-1 ¶ 6.)

23        On October 25, 2016, the parties stipulated to certification of the following class for

24   purposes of bringing cross-motions for summary adjudication:

25   _____

26   [3]  The motion states that one of defendant's common practices is "*including* meal and lodging
     benefits into the regular rate of pay calculations."  (Doc. No. 30 at 11 (emphasis added).)  In light

27   of the entirety of the record, however, the court believes this to be a typographical error.
     (*Compare* Doc. No. 34 at 19 (disputing "whether [defendant] violated the FLSA by *excluding* the

28   value of lodging and meals from the calculation of overtime wages.") (emphasis added).)

1
2
3

> Defendant's non-exempt employees that worked and stayed on oil platforms located in federal waters off the California coast for periods of 24 hours or more, to the extent such employees' state wage and hour claims arise from or relate to this fact ("MSA Class").

4   (Doc. No. 19 at 7.)  The parties agreed that summary adjudication of defendant's preemption

5   affirmative defense was significant in this case, and thus the state court ordered class certification

6   for this limited purpose and a class notice was subsequently mailed.  (*Id.*)  On April 28, 2017,

7   defendant moved for summary adjudication of its affirmative defense of "Preemption," asserting

8   that California law was/is inapplicable to the subject offshore oil rigs.  (*Id.*)

9       On August 15, 2017, the parties stipulated to modify the motion for summary adjudication

10  hearing schedule in response to a pending appeal before the Ninth Circuit Court of Appeals which

11  addressed identical issues raised in defendant's motion for summary adjudication.  *See Newton v.*

12  *Parker Drilling Mgmt. Servs., Inc.*, No. 2:15-cv-02517 (C.D. Cal. Aug. 10, 2015).  The Ninth

13  Circuit rendered its opinion in *Newton* on February 5, 2018, holding that California labor law was

14  and is "applicable" to the work performed by the MSA Class and "not inconsistent" with federal

15  law.  *See Newton v. Parker Drilling Mgmt. Servs., Ltd.*, 881 F.3d 1078 (9th Cir. 2018), *vacated*

16  *and remanded by Parker Drilling Mgmt. Servs., Ltd. v. Newton*, __U.S.__, 139 S. Ct. 1881 (2019)

17  ("*Newton*").  The Ninth Circuit thus held that California state wage and hour laws are adopted as

18  surrogate federal law on the offshore platforms.  *Id.* at 1081–82.

19      Following supplemental briefing on the *Newton* decision, defendant moved to stay the

20  action, but that motion was denied.  (Doc. No. 19 at 7.)  Prior to the parties' second mediation, the

21  court subsequently denied defendant's motion for summary adjudication on June 15, 2018,

22  holding that California law is not preempted by federal law for offshore platforms on California's

23  OCS, and defendant's oral request for a stay was denied.  (*Id.* at 7–8.)  Defendant filed writs with

24  both the state appellate and supreme court, both of which were denied.  (*Id.* at 8.)  Thereafter, a

25  second private mediation session was held on November 19, 2018, in Bakersfield, California.

26  (Doc. No. 30-1 ¶ 6.)

27      On February 1, 2019, defendant filed a renewed motion to stay all further proceedings

28  pending a final decision by the United States Supreme Court in *Parker Drilling Management*

4

*Services, Ltd. v. Newton*, including plaintiff's then-pending motion for class certification.  (*Id.*) The Supreme Court issued its opinion on June 10, 2019, reversing the Ninth Circuit and holding that where federal law addresses the relevant issue, state law is not adopted as surrogate federal law on the OCS.[4]  *Newton*, 139 S. Ct. at 1881.

In light of the Supreme Court's decision, the parties stipulated that plaintiffs would amend the complaint in this action to assert an overtime claim under the Fair Labor Standards Act ("FLSA") and a rest break claim under California law, among other clarifications of the pleadings, and plaintiffs filed their second amended complaint on August 22, 2019.  (Doc. Nos. 1-6, 1-7.)  Thereafter, on September 19, 2019, defendant removed the action to this federal court.  (Doc. No. 1.)  The parties again stipulated to plaintiffs' filing of a third amended complaint, which was filed on January 29, 2020.  (Doc. Nos. 13–15.)

On February 28, 2020, plaintiffs filed a motion for conditional certification and facilitated notice under the FLSA, which defendant opposed.  (Doc. Nos. 19, 21.)  The assigned magistrate judge issued findings and recommendations on April 29, 2020, recommending that plaintiffs' motion be granted.  (Doc. No. 24.)  Defendant filed objections to the findings and recommendations, and plaintiffs filed a response.  (Doc. Nos. 25, 26.)

The parties participated in their final private mediation session on September 18, 2020, which was conducted via Zoom with California Justice Stephen J. Kane (Ret.) presiding over the negotiations.  (Doc. No. 30 at 9.)  Following the conclusion of that mediation, the parties agreed to settlement terms, and on September 29, 2020, the parties notified the court of their settlement.  (Doc. No. 28.)  The assigned magistrate judge ordered the parties to file a motion for preliminary approval of the class and representative action by December 18, 2020, and vacated all pending dates, conferences, and hearings.  (Doc. No. 29.)

---

[4]  In light of the Supreme Court's decision, the Ninth Circuit has since held that "[f]ederal law therefore addresses meal and rest periods, and California law does not provide the rule of decision for meal- and rest-time claims arising on the OCS."  *Mauia*, 5 F.4th at 1075.  The Ninth Circuit further found that federal law addresses pay-stub and waiting-time-penalty claims.  *Newton*, 860 Fed. Appx. at 538 (also concluding the district court properly dismissed the unfair competition and PAGA claims because they were "predicated on [defendant's] alleged violations of state wage-and-hour laws, including those for unpaid meal and rest period premiums.").

1    **C.    Settlement**

2            On December 14, 2020, plaintiffs filed the present unopposed motion for preliminary

3    approval of class action settlement.  (Doc. No. 30; *see generally* Ex. 3, Hefelfinger Decl., Doc.

4    No. 30-1, at 56–104.)  Pursuant to the settlement agreement, plaintiffs seek to certify the

5    following settlement class ("Rule 23 class") of an estimated 307 individuals ("class members"):

6                    All non-exempt employees of [defendant] who, at any time between
                     June 22, 2011 and the present (the "Claims Period"), worked and
7                    stayed on oil platforms off of the California coast for periods of 24
                     consecutive hours or more any time during the Claims Period.
8

9    (Doc. No. 30 at 61.)  Plaintiffs also seek to conditionally certify the following FLSA collective

10   ("FLSA collective"):

11                   All current and former hourly employees of [defendant] who, at any
                     time within four years from the date of filing of this lawsuit, worked
12                   on oil platforms off of the California coast and who stayed on such
                     platforms for periods of 24 hours or more.
13

14   (Doc. No. 34 at 22–23 (citing Doc. No. 15 at 17).)  All class members "are all eligible to

15   participate in the FLSA settlement as well as Rule 23 class action settlement."  (Doc. No. 34 at

16   23.)  Class members can release their FLSA claims by opting into the FLSA payment by

17   submitting a timely and valid FLSA claim form.  (Doc. No. 30 at 59–60, 66, 101–03, 102.)

18           Under the proposed settlement agreement, defendant would pay a sum of $2,400,000.  (*Id.*

19   at 61.)  The agreement provides for the following allocation of that payment:  (1) $100,000 to the

20   resolution of PAGA claims, with $75,000 of that amount to be paid to the California Labor and

21   Workforce Development Agency ("LWDA"); (2) an estimated $15,000 to the settlement

22   administrator; (3) $35,000 to plaintiff Newell and $25,000 to plaintiff Calderon as enhancement

23   awards; (4) 35 percent, or $840,000, to be paid to class counsel in attorneys' fees; and (5)

24   estimated litigation costs of up to $15,000.  (*Id.* at 60–61, 68, 79, 80.)  After these deductions,

25   each member of the settlement class will be entitled to a pro rata amount of the net settlement

26   fund "based on his or her hours during the Claim Period (which shall be from the data supplied by

27   Defendant to the Claims Administrator)."  (*Id.* at 75.)  Fourteen percent of the remaining amount,

28   or $200,000, has been allocated toward the resolution of the FLSA claims.  (*Id.* at 60.)

6

1      Plaintiffs seek an order from this court:  (1) preliminarily approving the joint stipulation of

2    settlement between plaintiffs and defendant; (2) conditionally certifying the settlement class and

3    appointing the named plaintiffs to represent the settlement class; (3) conditionally certifying the

4    FLSA collective action; (4) approving the proposed form and content of the notice of class action

5    settlement and related notice packet, including the opt-in procedures for the FLSA collective

6    action; (5) approving the implementation schedule; (6) approving CPT Group, Inc., as the claims

7    administrator; and (7) scheduling a final fairness hearing.  (Doc. No. 30 at 2.)

8                                   **LEGAL STANDARDS**

9    **A.**      **Rule 23 Settlements**

10      Federal Rule of Civil Procedure 23(e) provides that "[t]he claims, issues, or defenses of a

11    certified class—or a class proposed to be certified for purposes of settlement—may be settled,

12    voluntarily dismissed, or compromised only with the court's approval."  "Courts have long

13    recognized that settlement class actions present unique due process concerns for absent class

14    members."  *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011)

15    (internal quotation marks and citations omitted).  To protect the rights of absent class members,

16    Rule 23(e) requires that the court approve all class action settlements "only after a hearing and on

17    finding that it is fair, reasonable, and adequate . . ."  Fed. R. Civ. P. 23(e)(2); *see also Bluetooth*,

18    654 F.3d at 946.  But when parties seek approval of a settlement agreement negotiated before

19    formal class certification, "there is an even greater potential for a breach of fiduciary duty owed

20    the class during settlement."  *Bluetooth*, 654 F.3d at 946.  Thus, the court must review such

21    agreements with "a more probing inquiry" for evidence of collusion or other conflicts of interest

22    than what is normally required under the Federal Rules.  *Hanlon v. Chrysler Corp.*, 150 F.3d

23    1011, 1026 (9th Cir. 1998), *overruled on other grounds by Wal-Mart Stores, Inc. v. Dukes*, 564

24    U.S. 338 (2011); *see also Lane v. Facebook, Inc.*, 696 F.3d 811, 819 (9th Cir. 2012).

25      Review of a proposed class action settlement ordinarily proceeds in three stages.  *See*

26    MANUAL FOR COMPLEX LITIGATION (4th) § 21.632.  First, the court conducts a preliminary

27    fairness evaluation and, if applicable, considers class certification.  *Id.* (noting that if the parties

28    move for both class certification and preliminary approval, the certification hearing and

1   preliminary fairness evaluation can usually be combined).  Second, if the court makes a

2   preliminary determination on the fairness, reasonableness, and adequacy of the settlement terms,

3   the parties are directed to prepare the notice of certification and proposed settlement to the class

4   members.  *Id.*  Third, the court holds a final fairness hearing to determine whether to approve the

5   settlement.  *Id.*; *see also Narouz v. Charter Commc'ns, LLC*, 591 F.3d 1261, 1267

6   (9th Cir. 2010).

7          "In December 2018, Congress and the Supreme Court amended Rule 23(e) to set forth

8   specific factors to consider in determining whether a settlement is 'fair, reasonable, and

9   adequate.'"  *Briseño v. Henderson*, 998 F.3d 1014, 1023 (9th Cir. 2021); *see* Fed. R. Civ. P.

10  23(e)(2) (effective Dec. 1, 2018).  In considering whether "the relief provided for the class is

11  adequate," the court must take into account:

12                  (i)  the costs, risks, and delay of trial and appeal;

13                  (ii)  the effectiveness of any proposed method of distributing relief
14                  to the class, including the method of processing class-member
                    claims;

15                  (iii)  the terms of any proposed award of attorney's fees, including
                    timing of payment; and
16

17                  (iv)  any agreement required to be identified under Rule 23(e)(3)[.]

18  Fed. R. Civ. P. 23(e)(2)(C); *see Briseño*, 998 F.3d at 1023–24.

19         Federal courts generally find preliminary approval of the settlement and notice to the

20  proposed class appropriate if "the proposed settlement appears to be the product of serious,

21  informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant

22  preferential treatment to class representatives or segments of the class, and falls within the range

23  of possible approval."  *Lounibos v. Keypoint Gov't Sols. Inc.*, No. 12-cv-00636-JST, 2014 WL

24  558675, at *5 (N.D. Cal. Feb. 10, 2014) (quoting *In re Tableware Antitrust Litig.*, 484 F. Supp.

25  2d 1078, 1079 (N.D. Cal. 2007)); *see also* NEWBERG ON CLASS ACTIONS § 13:13 (5th ed. 2011);

26  *Briseño*, 998 F.3d at 1027–28 ("The district court thus should give a hard look at the settlement

27  agreement to ensure that the parties have not colluded at class members' expense.").  "The court

28  need not 'reach any ultimate conclusions on the contested issues of fact and law which underlie

                                          8

1   the merits of the dispute.'"  *Chem. Bank v. City of Seattle*, 955 F.2d 1268, 1291 (9th Cir. 1992)

2   (quoting *Officers for Just. v. Civil Serv. Comm'n of City & Cnty. of S.F.*, 688 F.2d 615, 625 (9th

3   Cir. 1982)).  Rather, the court should weigh, among other factors, the strength of a plaintiff's

4   case; the risk, expense, complexity, and likely duration of further litigation; the extent of

5   discovery completed; and the value of the settlement offer.  *Id.*

6   **B.      PAGA Settlements**

7            Under PAGA, an "aggrieved employee"[5] may bring an action for civil penalties for

8   California Labor Code violations on behalf of himself and other current or former employees.

9   Cal. Lab. Code § 2699(a).  A plaintiff suing under PAGA "does so as the proxy or agent of the

10  state's labor law enforcement agencies." *Arias v. Superior Ct.*, 46 Cal. 4th 969, 986 (2009).

11  Accordingly, a judgment in a PAGA action "binds all those, including nonparty aggrieved

12  employees, who would be bound by a judgment in an action brought by the government." *Id.*; *see*

13  *also Iskanian v. CLS Transp. L.A., LLC*, 59 Cal. 4th 348, 381 (2014) ("When a government

14  agency is authorized to bring an action on behalf of an individual or in the public interest, and a

15  private person lacks an independent legal right to bring the action, a person who is not a party but

16  who is represented by the agency is bound by the judgment as though the person were a party.").

17           The PAGA statute imposes a number of limitations on litigants.  First, because a PAGA

18  action functions as a "substitute" for an action brought by the state government, a plaintiff suing

19  under PAGA is limited to recovery of civil penalties only, rather than damages or unpaid wages

20  available privately through direct or class action claims. *Iskanian*, 59 Cal. 4th at 381; *ZB, N.A. v.*

21  *Superior Ct.*, 8 Cal. 5th 175 (2019).  Second, to bring an action under PAGA, an aggrieved

22  employee must first provide written notice to the LWDA as well as to the employer.  Cal. Lab.

23  Code § 2699.3(a)(1).  Third, any civil penalties recovered must be divided 75 percent with the

24  LWDA and 25 percent with the aggrieved employees.  *Id.* § 2699(i).  Finally, the proposed

25  settlement of PAGA claims must be submitted to the LWDA and a trial court must "review and

26

27  _____

    [5]  An "aggrieved employee" is defined as "any person who was employed by the alleged violator
28  and against whom one or more of the alleged violations was committed."  Cal. Lab. Code §
    2699(c).

approve" any settlement of such claims. *Id.* § 2699(l)(2).  Although there is no binding authority

setting forth the proper standard of review for PAGA settlements, in the class action context

where PAGA claims often appear, courts must independently determine that a proposed

settlement agreement is "fundamentally fair, adequate and reasonable" before granting approval.

*See In re Heritage Bond Litig.*, 546 F.3d 667, 674–75 (9th Cir. 2008).  The determination of

fairness, reasonableness, and adequacy may involve a balancing of several factors including but

not limited to the following:  the strength of plaintiffs' claims; the risk, expense, complexity, and

likely duration of further litigation; the amount offered in settlement; the extent of discovery

completed, and the stage of the proceedings; and the experience and views of counsel. *Officers*

*for Just.*, 688 F.2d at 625.

        The LWDA has also provided some guidance regarding court approval of PAGA

settlements.  In a case where both class action and PAGA claims were covered by a proposed

settlement, the LWDA stressed that

> when a PAGA claim is settled, the relief provided for under the
> PAGA [must] be genuine and meaningful, consistent with the
> underlying purpose of the statute to benefit the public and, in the
> context of a class action, the court [must] evaluate whether the
> settlement meets the standards of being "fundamentally fair,
> reasonable, and adequate" with reference to the public policies
> underlying the PAGA.

California Labor and Workforce Development Agency's Comments on Proposed PAGA

Settlement ("LWDA Letter"), *O'Connor v. Uber Techs., Inc.*, No. 3:13-cv-03826-EMC (N.D.

Cal. July 29, 2016) (Doc. No. 736 at 2–3);[6] *O'Connor v. Uber Techs., Inc.*, 201 F. Supp. 3d 1110,

1133 (N.D. Cal. 2016) (citing the LWDA Letter with approval).

        Recognizing the distinct issues presented by class actions, this court is persuaded by the

LWDA's reasoning in *O'Connor* and therefore adopts its proposed standard in evaluating the

PAGA portion of the settlement now before the court. *See, e.g.*, *Tenorio v. Gallardo*, No. 1:1-cv-

00283-DAD-JLT, 2019 WL 4747949, at *3 (E.D. Cal. Sept. 30, 2019); *Patel v. Nike Retail*

---

[6]  In the LWDA Letter, the LWDA also stated that it "is not aware of any existing case law
establishing a specific benchmark for PAGA settlements, either on their own terms or in relation
to the recovery on other claims in the action."

1  *Servs., Inc.*, No. 14-cv-04781-RS, 2019 WL 2029061, at *2 (N.D. Cal. May 8, 2019).

2  Accordingly, the court will approve a settlement of PAGA claims upon a showing that the

3  settlement terms (1) meet the statutory requirements set forth by PAGA, and (2) are

4  fundamentally fair, reasonable, and adequate in view of PAGA's public policy goals.

5  **C.    FLSA Settlements**

6          Under the FLSA, an employee may file a civil action against an employer that fails to

7  adhere to the FLSA's guarantees.  29 U.S.C. § 216(b); *see also Genesis Healthcare Corp. v.*

8  *Symczyk*, 569 U.S. 66, 69 (2013) ("The FLSA establishes federal minimum-wage, maximum-

9  hour, and overtime guarantees that cannot be modified by contract.").  Employees may bring

10 collective actions under the FLSA, representing all "similarly situated" employees, but "each

11 employee [must] opt-in to the suit by filing a consent to sue with the district court."  *Does I thru*

12 *XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1064 (9th Cir. 2000); *see also Jones v. Agilysys,*

13 *Inc.*, No. C 12–03516 SBA, 2014 WL 108420, at *2 (N.D. Cal. Jan. 10, 2014).  Because an

14 employee cannot waive claims under the FLSA, the claims may not be settled without supervision

15 of either the Secretary of Labor or a district court.  *See Barrentine v. Ark.-Best Freight Sys., Inc.*,

16 450 U.S. 728, 740 (1981); *Beidleman v. City of Modesto*, No. 1:16-cv-01100-DAD-SKO, 2018

17 WL 1305713, at *1 (E.D. Cal. Mar. 13, 2018); *Yue Zhou v. Wang's Rest.*, No. 05-cv-0279 PVT,

18 2007 WL 2298046, at *1 n.1 (N.D. Cal. Aug. 8, 2007).  The decision to certify a FLSA collective

19 action is within the discretion of the district court.  *See Edwards v. City of Long Beach*, 467 F.

20 Supp. 2d 986, 989 (C.D. Cal. 2006).

21         The Ninth Circuit has not established criteria for district courts to determine whether an

22 FLSA settlement should be approved.  *Dunn v. Teachers Ins. & Annuity Ass'n of Am.*, No. 13-cv-

23 05456-HSG, 2016 WL 153266, at *3 (N.D. Cal. Jan. 13, 2016).  Rather, district courts in this

24 circuit routinely apply the Eleventh Circuit standard, which looks to whether the settlement is a

25 fair and reasonable resolution of a bona fide dispute.  *Id.*; *see also Lynn's Food Stores, Inc. v.*

26 *United States*, 679 F.2d 1350, 1352–53 (11th Cir. 1982); *Milburn v. PetSmart, Inc.*, No. 1:18-cv-

27 00535-DAD-SKO, 2019 WL 1746056, at *4 (E.D. Cal. Apr. 18, 2019); *Selk v. Pioneers Mem'l*

28 *Healthcare Dist.*, 159 F. Supp. 3d 1164, 1172 (S.D. Cal. 2016); *Nen Thio v. Genji, LLC*, 14 F.

1   Supp. 3d 1324, 1333 (N.D. Cal. 2014).  "A *bona fide* dispute exists when there are legitimate

2   questions about the existence and extent of Defendant's FLSA liability."  *Selk*, 159 F. Supp. 3d

3   at 1172 (internal quotation marks and citations omitted).  A court will not approve a settlement

4   when there is certainty that the FLSA entitles plaintiffs to the compensation they seek, because

5   doing so would shield employers from the full cost of complying with the statute.  *Id.*

6          If a *bona fide* dispute exists, "[c]ourts often apply the Rule 23 factors in evaluating the

7   fairness of an FLSA settlement, while recognizing that some do not apply because of the inherent

8   differences between class actions and FLSA actions."  *Khanna v. Inter-Con Sec. Sys., Inc.*, No.

9   civ S-09-2214 KJM, 2013 WL 1193485, at *2 (E.D. Cal. Mar. 22, 2013) (internal quotation

10  marks and citations omitted).  The balancing factors include:

11             the strength of the plaintiffs' case; the risk, expense, complexity, and
               likely duration of further litigation; the risk of maintaining class
12             action status throughout the trial; the amount offered in settlement;
               the extent of discovery completed and the stage of the proceedings;
13             the experience and views of counsel; the presence of a governmental
               participant; and the reaction of the class members to the proposed
14             settlement.

15  *Khanna v. Intercon Sec. Sys., Inc.*, No. 2:09-cv-2214 KJM EFB, 2014 WL 1379861, at *6 (E.D.

16  Cal. Apr. 8, 2014), *order corrected*, 2015 WL 925707 (E.D. Cal. Mar. 3, 2015).

17                                    **ANALYSIS**

18  **A.     Preliminary Certification of Class**

19         Certification requires satisfaction of the pre-requisites of Rule 23(a) and (b).  *Pointer v.

20  Bank of Am. Nat'l Ass'n*, No. 2:14-cv-00525-KJM-CKD, 2016 WL 696582, at *3 (E.D. Cal. Feb.

21  22, 2016) (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 622 (1997)).

22         1.     Rule 23(a) Requirements

23         "Rule 23(a) establishes four prerequisites for class action litigation:  (i) numerosity,

24  (ii) commonality, (iii) typicality, and (iv) adequacy of representation."  *Staton v. Boeing Co.*, 327

25  F.3d 938, 953 (9th Cir. 2003).  The court will address each requirement in the context of this case

26  below.

27  /////

28  /////

                                      12

1          a.      *Numerosity*

2          A proposed class must be "so numerous that joinder of all members is impracticable."

3  Fed. R. Civ. P. 23(a)(1).  The numerosity requirement demands "examination of the specific facts

4  of each case and imposes no absolute limitations."  *Gen. Tel. Co. of Nw., Inc. v. EEOC*, 446 U.S.

5  318, 330 (1980).  Courts have found the requirement satisfied when the class comprises as few as

6  thirty-nine members, or where joining all class members would serve only to impose financial

7  burdens and clog the court's docket.  *See Murillo v. Pac. Gas & Elec. Co.*, 266 F.R.D. 468, 474

8  (E.D. Cal. 2010) (citing *Jordan v. L.A. Cnty.*, 669 F.2d 1311, 1319 (9th Cir. 1982) (discussing

9  Ninth Circuit thresholds for numerosity), *vacated on other grounds*, 459 U.S. 810 (1982)); *In re

10 Itel Sec. Litig.*, 89 F.R.D. 104, 112 (N.D. Cal. 1981).  Here, plaintiffs estimate that there are

11 approximately 307 members in the settlement class.  (Doc. No. 30 at 24.)  This showing with

12 respect to numerosity is adequate to meet the requirements of Rule 23(a)(1).  *See Murillo*, 266

13 F.R.D. at 474.

14         b.      *Commonality*

15         Rule 23(a) also requires "questions of law or fact common to the class."  Fed. R. Civ. P.

16 23(a)(2).  However, the raising of merely any common question does not suffice.  *See Dukes*, 564

17 U.S. at 349 ("[a]ny competently crafted class complaint literally raises common 'questions.'")

18 (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L.

19 REV. 97, 131–32 (2009)).  To satisfy the commonality requirement, the class representatives must

20 demonstrate that common points of facts and law will drive or resolve the litigation.  *Id.* at 350

21 ("What matters to class certification . . . is not the raising of common 'questions'—even in

22 droves—but, rather the capacity of a classwide proceeding to generate common answers apt to

23 drive the resolution of the litigation.") (internal citations omitted).  "[C]ommonality is generally

24 satisfied where . . . 'the lawsuit challenges a system-wide practice or policy that affects all of the

25 putative class members.'"  *Franco v. Ruiz Food Prods., Inc.*, No. cv 10-02354 SKO, 2012 WL

26 5941801, at *5 (E.D. Cal. Nov. 27, 2012) (quoting *Armstrong v. Davis*, 275 F.3d 849, 868 (9th

27 Cir. 2001), *abrogated on other grounds by Johnson v. Cal.*, 543 U.S. 499, 504–05 (2005)).  The

28 rule does not require all questions of law or fact to be common to every single class member.  *See*

1    *Hanlon*, 150 F.3d at 1019 (noting that commonality can be found through "[t]he existence of

2    shared legal issues with divergent factual predicates").

3          Here, plaintiffs argue that all settlement class members were subject to the same offshore

4    wage and hour policies and practices of defendant.  (Doc. No. 30 at 25.)  Such common policies

5    and practices include:

6              (1) requiring employees to remain on the oil platforms for the
               duration of their hitch; (2) only paying employees for 12 or so hours
7              of active work time each day; (3) not paying employees for
               approximately 12 hours of "controlled standby" time each day,
8              whether at overtime, doubletime, or minimum wage rates; (4) not
               having employees clock out for or receive duty free meal periods; (5)
9              requiring employees to be ready to respond to alarms and calls during
               "on duty" and "controlled standby" time; and (6) [failing to add]
10             meal and lodging benefits into the regular rate of pay calculations.

11   (*Id.* at 11.)  Because it appears that the same conduct which defendant allegedly engaged in

12   "would form the basis of each of the plaintiff's claims," the court finds that commonality is

13   satisfied.  *Murillo*, 266 F.R.D. at 475 (citing *Acosta v. Equifax Info. Servs., L.L.C.*, 243 F.R.D.

14   377, 384 (C.D. Cal. 2007)) (internal quotation marks omitted).

15                         c.    *Typicality*

16         Rule 23(a)(3) also requires that "the claims or defenses of the representative parties are

17   typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3); *Armstrong*, 275 F.3d at

18   868.  Typicality is satisfied "when each class member's claim arises from the same course of

19   events, and each class member makes similar legal arguments to prove the defendant's liability."

20   *Armstrong*, 275 F.3d at 868; *see also Kayes v. Pac. Lumber Co.*, 51 F.3d 1449, 1463 (9th Cir.

21   1995) (claims are typical where named plaintiffs have the same claims as other members of the

22   class and are not subject to unique defenses).  While representative claims must be "reasonably

23   co-extensive with those of absent class members," they "need not be substantially identical."

24   *Hanlon*, 150 F.3d at 1020; *see also Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508

25   (9th Cir. 1992).

26         Here, the named plaintiffs "worked for [defendant] on federal offshore platforms,

27   performing non-exempt work."  (Doc. No. 30 at 10.)  Specifically, like the putative class,

28   plaintiffs worked and stayed on the oil platforms off of the California coast for periods of 24

                                            14

1    consecutive hours or more at any time during the claims period.  (*Id.* at 25–26.)  Plaintiffs state

2    that they and the putative class members have worked under the same practices and policies and

3    suffered the same injuries as a result of those common practices and policies.  (*See id.* at 10–12.)

4    The court concludes that plaintiffs' claims are reasonably co-extensive with those of the absent

5    class members, and that typicality is therefore satisfied here.

6                          d.      *Adequacy of Representation*

7            The final Rule 23(a) prerequisite is satisfied if "the representative parties will fairly and

8    adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  "The proper resolution of

9    this issue requires that two questions be addressed:  (a) do the named plaintiffs and their counsel

10   have any conflicts of interest with other class members and (b) will the named plaintiffs and their

11   counsel prosecute the action vigorously on behalf of the class?"  *In re Mego Fin. Corp. Sec.*

12   *Litig.*, 213 F.3d 454, 462 (9th Cir. 2000); *see also Pierce v. Cnty. of Orange*, 526 F.3d 1190, 1202

13   (9th Cir. 2008).

14           Here, plaintiffs' counsel states that there are no conflicts of interest between the named

15   plaintiffs and any other class member.  (Doc. No. 30 at 26.)  Counsel also states that the named

16   plaintiffs do not have "interests that are antagonistic to other Class members and, in fact, they

17   share a strong and identical interest in protecting Class Members and their interests."  (*Id.*)  The

18   court finds no reason in the record before it to question these assertions.  Additionally, plaintiffs

19   seek appointment of their current counsel, Daniel J. Palay, Esq., and Brian D. Hefelfinger, Esq.,

20   as class counsel.  (Ex. 3, Doc. No. 30-1 at 58.)  Both attorneys "have substantial experience

21   litigating and settling complex employment law actions involving the same issues raised by this

22   case, including prior class action experience with these same legal issues."  (Doc. No. 30 at 26;

23   Hefelfinger Decl., Doc. No. 30-1 ¶¶ 27–30.)  As such, the court finds that the named plaintiffs

24   and plaintiffs' counsel satisfy the adequacy of representation requirement.

25                   2.      Rule 23(b)(3) Requirements

26           The parties here seek certification under Rule 23(b)(3), which requires:  (i) that the

27   questions of law or fact common to class members predominate over any questions affecting only

28   individual members; and (ii) that a class action is superior to other available methods for fairly

                                            15

1   and efficiently adjudicating the controversy.  *See Amchem*, 521 U.S. at 615.  The test of Rule

2   23(b)(3) is "far more demanding" than that of Rule 23(a).  *Wolin v. Jaguar Land Rover N. Am.*,

3   617 F.3d 1168, 1172 (9th Cir. 2010) (quoting *Amchem*, 521 U.S. at 623–24).  The court will

4   examine each requirement in turn below.

5                    a.        *Predominance*

6        First, common questions must "predominate" over any individual questions. While this

7   requirement is like the Rule 23(a)(2) commonality requirement, the standard is much higher at

8   this stage of the analysis.  *Dukes*, 564 U.S. at 359; *Amchem*, 521 U.S. at 624–25; *Hanlon*, 150

9   F.3d at 1022 (9th Cir. 1998).  While Rule 23(a)(2) can be satisfied by even a single question, Rule

10  23(b)(3) requires convincing proof that the common questions "predominate."  *Amchem*, 521 U.S.

11  at 623–24; *Hanlon*, 150 F.3d at 1022.  "When common questions present a significant aspect of

12  the case and they can be resolved for all members of the class in a single adjudication, there is

13  clear justification for handling the dispute on a representative rather than on an individual basis."

14  *Hanlon*, 150 F.3d at 1022.

15       As discussed above, plaintiffs claim that the settlement class members "worked in similar

16  offshore locations, were affected by common policies, and maintained common claims based

17  upon the Defendant['s] uniform offshore worker policies which affected their wages and hours."

18  (Doc. No. 30 at 27.)  Specifically, "all of the putative class worked off-shore for the duration of

19  each hitch, but were only paid for the 12–13 hours per day they were scheduled to work and were

20  not paid meal and rest period premiums for every day spent off-shore, even though they were not

21  able to return to shore during meal and rest periods."  (Doc. No. 34 at 10.)  Plaintiffs also contend

22  the predominant legal issue is the same for all class members, i.e., whether federal or state law

23  should apply to work performed on the OCS.  (*Id.* at 10.)  Class actions in which a defendant's

24  uniform policies are challenged generally satisfy the predominance requirement of Rule 23(b)(3).

25  *See Palacios v. Penny Newman Grain, Inc.*, No. 1:14-cv-01804-KJM, 2015 WL 4078135, at *5–6

26  (E.D. Cal. July 6, 2015); *Clesceri v. Beach City Investigations & Protective Servs., Inc.*, No. cv-

27  10-3873-JST RZX, 2011 WL 320998, at *7 (C.D. Cal. Jan. 27, 2011).  The court therefore

28  concludes that the predominance requirement has been met in this case.

                                                          16

b.      *Superiority*

Rule 23(b)(3) also requires a court to find "a class action is superior to other available methods for the fair adjudication of the controversy." Fed. R. Civ. P. 23(b)(3).  In resolving the Rule 23(b)(3) superiority inquiry, "the court should consider class members' interests in pursuing separate actions individually, any litigation already in progress involving the same controversy, the desirability of concentrating in one forum, and potential difficulties in managing the class action—although the last two considerations are not relevant in the settlement context." *Palacios*, 2015 WL 4078135, at *6 (citing *Schiller v. David's Bridal Inc.*, No. 10-cv-0616-AWI-SKO, 2012 WL 2117001, at *10 (E.D. Cal. June 11, 2012)).

Here, plaintiffs assert that the superiority requirement is satisfied for the following reason:

> Because of the U.S. Supreme Court's binding precedent regarding applicable law on the OCS, decided in June 2019 during the pendency of this case . . ., there is simply no benefit to individual class members pursuing separate actions individually. . . .  [A]ny separate actions commenced – whether in court or in arbitration – would arguably be futile in light of Supreme Court precedent.

(Doc. No. 34 at 11, 12 ("The legal issues have been tested and decided at the Supreme Court, in similar litigation for other offshore workers on the same platforms (*e.g.*, *Newton*).").)  Furthermore, "[t]he instant matter has been extensively prosecuted by competent counsel on both sides, for nearly six years, including the litigation of both substantive and class/collective certification issues." (*Id.* at 12.)  In addition to the named plaintiffs and putative class members being subject to the same policies and practices, plaintiffs contend that "class actions are generally superior to individual adjudications in the wage/hour context, because the alternative to a class case in the context of employment disputes is often no case at all because workers fear economic retaliation (termination)." (*Id.*)  Absent class treatment, "the modest *per capita* recovery for many of the workers, particularly those with fewer workweeks in the claim period, is unlikely to be vindicated by individual cases for fear of economic retaliation." (Id. (emphasis in original).)  These reasons are persuasive, and warrant finding that the superiority requirement is satisfied here.

/////

17

**B.      Conditional Certification of Collective Action Under FLSA[7]**

As discussed above, plaintiffs seeking conditional certification of a collective action under the FLSA have the burden to show that they are "similarly situated" to other employee class members.  *Litty v. Merrill Lynch & Co.*, No. cv 14-0425 PA (PJWX), 2015 WL 4698475, at *6 (C.D. Cal. Apr. 27, 2015); *see also Lewis v. Wells Fargo Co.*, 669 F. Supp. 2d 1124, 1127 (N.D. Cal. 2009).  When determining whether to conditionally certify the collective action, plaintiffs can show they are "'similarly situated' by making substantial allegations, supported by declarations or discovery, that 'the putative class members were together the victims of a single decision, policy, or plan.'"  *Litty*, 2015 WL 4698475, at *6; *see also Lewis*, 669 F. Supp. 2d at 1127.  Courts apply a lenient standard when determining whether to conditionally certify a collective action such as this.  *See Syed v. M-I, L.L.C.*, No. 1:12-cv-01718-AWI-MJS, 2014 WL 6685966, at *2 (E.D. Cal. Nov. 26, 2014).

Here, the parties contend that "[p]laintiffs and the putative collective are similarly situated because they were not paid overtime wages that included the value of lodging and meals as required under the FLSA's overtime requirements."  (Doc. No. 34 at 17.)  For all the reasons the requirements for preliminary certification under Rule 23 are satisfied, the proposed FLSA collective also satisfies the FLSA's less stringent requirement that the members be "similarly situated."  Conditional certification of the FLSA collective is therefore appropriate.

**C.      Preliminary Fairness Determination**

Plaintiffs also seek preliminary approval of the proposed settlement.  Because it has PAGA and FLSA components, the settlement must also meet certain requirements under those acts.  In addition, under Rule 23(e), a court may approve a class action settlement only if the settlement is a fair, reasonable, and adequate resolution of a *bona fide* dispute.  *Bluetooth*, 654

---

[7]  In its order for supplemental briefing, the court noted that defendant previously opposed the conditional certification of a FLSA collective in this case.  (*See* Doc. No. 33 at 9–10.)  In response, the joint supplemental brief provides that, "[a]lthough [defendant] disputed conditional certification in the context of litigation, for settlement purposes alone, the parties agree that it is appropriate to conditionally certify the FLSA collective in order to provide [defendant's] employees who worked and lodged offshore an opportunity to evaluate the settlement terms and 'opt-in' if they seek to participate."  (Doc. No. 34 at 18.)

1    F.3d at 946.  "[P]reliminary approval of a settlement has both a procedural and substantive

2    component."  *Tableware Antitrust Litig.*, 484 F. Supp. 2d at 1079 (citing *Schwartz v. Dall.*

3    *Cowboys Football Club, Ltd.*, 157 F. Supp. 2d 561, 570 n.12 (E.D. Pa. 2001)).  In particular,

4    preliminary approval of a settlement and notice to the proposed class is appropriate if:  (i) the

5    proposed settlement appears to be the product of serious, informed, non-collusive negotiations;

6    and (ii) the settlement falls within the range of possible approval, has no obvious deficiencies, and

7    does not improperly grant preferential treatment to class representatives or segments of the class.

8    *Id.*; *see also Ross v. Bar None Enters., Inc.*, No. 2:13–cv–00234–KJM–KJN, 2014 WL 4109592,

9    at *9 (E.D. Cal. Aug. 19, 2014).

10          1.      PAGA Component

11          PAGA requires that a proposed settlement be submitted to the LWDA.  Cal. Lab. Code

12   § 2699(l)(2); *see also Haralson v. U.S. Aviation Servs. Corp.*, 383 F. Supp. 3d 959, 971 (N.D.

13   Cal. 2019) (noting that a proposed settlement should be submitted to the LWDA to allow it to

14   comment if it so desires) (citing *Ramirez v. Benito Valley Farms, LLC*, No. 16-cv-04708-LHK,

15   2017 WL 3670794, at *2 (N.D. Cal. Aug. 25, 2017)).  Here, plaintiffs aver that the proposed

16   settlement was submitted to the LWDA on December 14, 2020.  (Supp. Hefelfinger Decl., Doc.

17   No. 34-1 ¶ 10; *see id.*, Ex. 2 (providing email confirmation of the LWDA's receipt of the

18   settlement on December 15, 2020).)  To date, the LWDA has neither objected to nor commented

19   on the settlement.  (*Id.* ¶ 11.)  The court will thus address the fairness, reasonableness, and

20   adequacy of the PAGA penalties below.

21          2.      FLSA Component

22          The parties assert that there are *bona fide* disputes about whether defendant complied with

23   the FLSA's requirements.  (*See* Doc. No. 34 at 18–22.)  First, while plaintiffs claim that

24   defendant violated the FLSA by excluding lodging and meals from the regular rate of pay,

25   defendant contends that "lodging and meals were not compensation for hours worked but

26   payments which are expressly required to be excluded under the FLSA."  (*Id.* at 19 (citing 29

27   U.S.C. § 207(e)(2), 29 C.F.R. § 778.224(a)–(b)).)  Second, the parties disagree over the

28   applicable claims period with respect to the FLSA collective.  (Doc. No. 34 at 20, 21.)  In

                                              19

1 particular, the parties dispute whether defendant's exclusion of lodging and meals was willful.

2 *See* 29 U.S.C. § 255(a) (providing the statute of limitations for FLSA claims is two years or three

3 years in cases involving willful violations).  Furthermore, plaintiffs maintain that the relation back

4 doctrine applies and thus the claim period is three years prior to the filing of the original

5 complaint, whereas defendant contends that the appropriate date is three years before the filing of

6 the amended complaint.  (Doc. No. 34 at 20.)

7          Third, the parties state that "even were a court to find lodging and meals were regarded as

8 wages, there is a *bona fide* dispute that any wages would be due—whether [defendant's] payment

9 of overtime and double time wages creates a complete offset of any overtime adjustments to the

10 regular rate of pay."  (Doc. No. 34 at 20; *see* Ex. 3, Supp. Hefelfinger Decl., Doc. No. 34-1 at 18–

11 19 (providing "a chart that reflects how [defendant] claims the offset amount would be calculated

12 in this matter.").)  Plaintiffs argue that "if the value of lodging and meals were used to calculate

13 the regular rate of pay there would result an increased overtime rate under the FLSA and

14 Plaintiffs would be owed the difference between wages paid and that adjusted rate."  (*Id.* at 20.)

15 On the other hand, defendant "asserts a complete offset for the double time premiums it paid

16 employees each shift," reasoning that "because putative class members have been paid overtime

17 and double time on a daily basis, when federal law only requires overtime rates after 40 total

18 hours in a week (not by day), the double time premiums [defendant] has paid will offset any

19 FLSA overtime award."  (*Id.* (citations omitted).)

20          Fourth, it is disputed between the parties "whether putative class members who

21 participated in a prior class action settlement are barred from litigating the FLSA and other state

22 claims that arose prior to March 26, 2015."  (*Id.* at 21 (citing *McDougle v. Ensign United States*

23 *Drilling (Cal.) Inc.*, Kern Cnty. Superior Ct. Case No. S-1500-CV-279842-LHB).)  Finally, the

24 parties claim that "there is a *bona fide* dispute regarding whether Calderon and other putative

25 collective members who signed arbitration agreements would be permitted to participate in a

26 FLSA collective action."  (Doc. No. 34 at 22.)  Defendant contends that plaintiff Calderon and

27 those class members "who worked for [defendant] any time after late 2015 have signed

28 arbitration agreements with class and representative action waivers[,]" while plaintiffs counter

20

1    that "the arbitration agreements 'carve out' the class claims that were already pending as of the

2    date those agreements were signed and, insofar that the FLSA claim relates back to the filing of

3    the original complaint on June 22, 2015, the FLSA claim is not governed by the arbitration

4    agreements." (*Id.*)  Based on all of the foregoing, the court is satisfied that there are *bona fide*

5    disputes at issue here.

6         3.    Procedural Fairness

7         The court must consider whether the process by which the parties arrived at their

8    settlement is truly the product of arms-length bargaining, rather than collusion or fraud.  *Millan v.*

9    *Cascade Water Servs., Inc.*, 310 F.R.D. 593, 613 (E.D. Cal. 2015).  A settlement is presumed fair

10   if it "follow[s] sufficient discovery and genuine arms-length negotiation." *Adoma v. Univ. of*

11   *Phx., Inc.*, 913 F. Supp. 2d 964, 977 (E.D. Cal. 2012) (quoting *Nat'l Rural Telecomms. Coop. v.*

12   *DIRECTV, Inc.*, 221 F.R.D. 523, 528 (C.D. Cal. 2004)).  Here, the parties assert that their

13   "settlement negotiations have been non-collusive, adversarial, and at arms'-length[,]" with each

14   side represented by competent and experienced counsel.  (Hefelfinger Decl., Doc. No. 30-1 ¶¶ 11,

15   18.)  Additionally, the "substantive legal issues in this matter were subject to contested motion

16   practice and appellate review, further evidencing the hard-fought nature of the claims and

17   defenses." (*Id.*)

18        As noted above, the parties engaged in three separate mediations, with the last two

19   sessions conducted by experienced class action mediator Justice Kane.  (*Id.* ¶¶ 6, 8, 15.)  Prior to

20   those mediation sessions, the parties engaged in substantial discovery, and defendants provided

21   plaintiffs with "information pertaining to the putative class members' work schedules, workplace

22   policies, meal and rest period practices, and pay practices." (*Id.* ¶ 12.)  Plaintiffs' counsel also

23   represents that they conducted extensive legal research and factual analysis to understand the

24   claims, potential defenses, and strengths and weaknesses for class certification and on the merits.

25   (*Id.* ¶¶ 12–13.)  Furthermore, the Ninth Circuit and Supreme Court decisions in *Newton* directly

26   impacted plaintiffs' case, with the Supreme Court's decision in *Newton* "effectively vitiat[ing] the

27   most valuable of the Plaintiffs' theories of recovery." (*Id.* ¶ 22.)  After the third mediation

28   session, the parties reached settlement only through a mediator's proposal.  (*Id.* ¶¶ 15–16.)  The

21

1   parties subsequently worked together to formalize the proposed settlement agreement.  (*Id.* ¶ 16.)

2   Based on these representations by counsel, it appears that the parties' negotiation constituted

3   genuine, informed, arms-length bargaining.

4        4.   Substantive Fairness

5             a.   *Adequacy of Settlement Amount*

6        To evaluate the fairness of the settlement award, the court should "compare the terms of

7   the compromise with the likely rewards of litigation."  *See Protective Comm. for Indep.*

8   *Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424–25 (1968).  "It is well-

9   settled law that a cash settlement amounting to only a fraction of the potential recovery does not

10  *per se* render the settlement inadequate or unfair."  *Mego*, 213 F.3d at 459.  To determine whether

11  a settlement "falls within the range of possible approval" a court must focus on "substantive

12  fairness and adequacy," and "consider plaintiffs' expected recovery balanced against the value of

13  the settlement offer."  *Tableware Antitrust Litig.*, 484 F. Supp. 2d at 1080.

14       Here, the total proposed gross settlement amount is $2,400,000 to be paid by defendant for

15  distribution to the class, payment of notice and claims administration costs, the payment of

16  PAGA penalties to LWDA, enhancement awards to the named plaintiffs, and attorneys' fees and

17  costs.  (Ex. 3, Hefelfinger Decl., Doc. No. 30-1 at 61.)  Assuming the various allocations

18  described above are awarded in full, the net settlement fund will be worth approximately

19  $1,395,000.  (*See id.* at 60–61, 68, 79, 80.)  Of that, $200,000 is allocated to settle the FLSA

20  claims and $25,000 is allocated toward the resolution of PAGA claims.  (*Id.* at 60.)  The entire net

21  settlement fund will be distributed to the participating Rule 23 and FLSA class members on a *pro*

22  *rata* basis based on the number of hours each class member worked during the claims period.  (*Id.*

23  at 75.)  Defendant has also agreed to separately cover the employer's share of payroll taxes on the

24  amounts paid as wages.  (*Id.* at 81.)

25       Plaintiffs estimate that the maximum potential damages for plaintiffs' state law claims are

26  approximately $5,800,000 (excluding attorneys' fees and interest), making the net settlement

27  amount of $2,200,000 allocated to the California claims a 38 percent recovery of plaintiffs' state

28  law claims.  (Doc. No. 34 at 26; Supp. Hefelfinger Decl., Doc. No. 34-1 ¶ 30.)  This settlement

amount is similar to percentage recoveries California district courts have found to be reasonable for this purpose. *See, e.g.*, *Villegas v. J.P. Morgan Chase & Co.*, No. 09-00261 SBA (EMC), 2012 WL 5878390, at *6 (N.D. Cal. Nov. 21, 2012) (settlement of approximately 15 percent of the maximum potential value found to be preliminarily fair); *Glass v. UBS Fin. Servs., Inc.*, No. C-06-4068, 2007 WL 221862, at *4 (N.D. Cal. Jan. 26, 2007) (settlement of approximately 25 to 35 of the maximum potential value percent was found to be reasonable).

The proposed settlement agreement also allocates approximately 8 percent of the net settlement fund to the FLSA collective only, leaving 92 percent allocated to the class claims. (Ex. 3, Hefelfinger Decl., Doc. No. 30-1 at 60.) Plaintiffs estimate that the maximum recovery of FLSA damages would be approximately $500,000 to $1,000,000, making the allocated net settlement amount of $200,000 a 40 percent to 20 percent recovery of plaintiffs' FLSA claim, respectively. (Supp. Hefelfinger Decl., Doc. No. 34-1 ¶ 25 (stating that the amount of recovery "depend[s] on the statute of limitations applied, value of lodging, enforcement of arbitration agreements, etc.").) The court finds this aspect of the proposed settlement to be a fair and reasonable resolution of a *bona fide* dispute under the FLSA. *See Thompson v. Costco Wholesale Corp.*, No. 14-cv-2778-CAB-WVG, 2017 WL 697895, at *8 (S.D. Cal. Feb. 22, 2017) ("[C]ourts that have approved settlements releasing both FLSA and Rule 23 claims generally do so only when the parties expressly allocate settlement payments to FLSA claims."); *see also Millan*, 310 F.R.D. at 602 (noting that "creation of separate settlement funds for the FLSA class and the Rule 23 class . . . would better protect absent class members"); *Khanna*, 2014 WL 1379861, at *2 (approving a hybrid settlement that allocated two-thirds of net settlement amount to state claims and one-third of net settlement amount to FLSA claims); *Pierce v. Rosetta Stone, Ltd.*, No. C 11-01283 SBA, 2013 WL 1878918, at *3 (N.D. Cal. May 3, 2013) (same).

Finally, the proposed settlement in this case also provides for $100,000 in civil PAGA penalties. (Ex. 3, Hefelfinger Decl., Doc. No. 30-1 at 60–61; *see also* Supp. Hefelfinger Decl., Doc. No. 34-1 ¶ 30 ("It is well-established that PAGA settlements, and even PAGA awards after trial, are highly variable and routinely a fraction of the maximum theoretical civil penalty amount because of the discretionary language in the PAGA statute.").) Pursuant to the PAGA, 75% of

1   the civil PAGA penalties, or $75,000, will go to the LWDA, and 25%, or $25,000, will remain as

2   part of the net settlement fund.  (Ex. 3, Hefelfinger Decl., Doc. No. 30-1 at 60–61; *see* Cal. Lab.

3   Code § 2699(i).)  The resulting $100,000 civil penalty thus represents 4% of the $2,400,000 gross

4   settlement fund.  The amount proposed to settle plaintiffs' PAGA claims is consistent with other

5   PAGA settlements approved by this court.  *See, e.g.*, *Syed*, 2017 WL 714367, at *13 (approving

6   $100,000.00 in PAGA penalties for a California class with a $3,950,000 gross settlement fund).

7   The court therefore concludes that the settlement of plaintiff's PAGA claims is fair, reasonable,

8   and adequate in light of the PAGA's public policy goals. *See O'Connor*, 201 F. Supp. 3d at 1133.

9       The court now turns to whether the overall settlement is fair, reasonable, and adequate.

10   Plaintiffs argue that the gross settlement amount reflecting a discount of the total possible

11   recovery is appropriate here for several reasons.  First, the Supreme Court's decision in *Newton*

12   and the Ninth Circuit decisions in *Mauia* and *Parker Drilling* were issued during the pendency of

13   this action and directly impacted plaintiffs' theories of recovery.  (Hefelfinger Decl., Doc. No. 30-

14   1 ¶ 22; *see* Doc. Nos. 35, 36.)  The parties agree that these court decisions "vitiate significant

15   portions of the offshore workers' claims – in those cases, and in this instant *Newell* matter – on

16   the basis of federal preemption," and that the class members are left "with significantly weakened

17   grounds for seeking damages should further litigation be pursued."  (Doc. No. 36 at 2.)  Despite

18   the risks and uncertainties, "the monetary damages negotiated for the Class provides a certain and

19   significant benefit where all signs point to the possibility of no recovery at all, should the case

20   proceed."  *Curtis v. Irwin Indus., Inc.*, Case No. 2:15-cv-02480-ODW (Ex), 2020 WL 9457057, at

21   *6–7 (C.D. Cal. Dec. 2, 2020) ("[I]n hindsight, it is clear that Plaintiffs had no guarantee of

22   recovery, given that recent Supreme Court precedent indicates that the overtime and minimum

23   wage claims originally failed as a matter of law."); *see also McClure v. Brand Energy Servs.*, No.

24   2:18-cv-01726-KJM-AC, 2021 WL 2168149, at *8 (E.D. Cal. May 27, 2021) (granting

25   preliminary approval of a settlement where "issues of first impression following [*Newton*] would

26   likely engender appeals if this litigation goes further, injecting ongoing uncertainty, expense, and

27   delay into the case" and that "[t]he parties engaged in significant negotiation in the shadow of

28   unresolved legal issues.").

1    Second, plaintiffs allege that defendant is "liable for unpaid wages, meal premiums,

2    reimbursements, and related penalties and interest" as a result of its common policies and

3    practices, whereas defendant disputes such allegations, contending that plaintiffs were properly

4    treated and regardless, plaintiffs' "state law claims would not extend to the [OCS]."  (Doc. No. 30

5    at 23.)  Third, other factors, such as "the likelihood of obtaining and maintaining class

6    certification with employees stationed at Defendant's worksites that are located on different

7    federal and state offshore platforms, and the existence of certain arbitration and release

8    agreements which Defendant would argue affected the putative class," further support

9    preliminary approval of the agreed-upon settlement.  (Hefelfinger Decl., Doc. No. 30-1 ¶ 23.)

10   Considering these anticipated defenses and circumstances, the court will preliminarily approve

11   the amount offered to settle the class and FLSA claims as reasonable.

12                    b.    *Attorneys' Fees*

13   When a negotiated class action settlement includes an award of attorneys' fees, the fee

14   award must be evaluated in the overall context of the settlement.  *Knisley v. Network Assocs.*, 312

15   F.3d 1123, 1126 (9th Cir. 2002); *see* Fed. R. Civ. P. 23(e)(2)(C)(iii) (considering "the terms of

16   any proposed award of attorney's fees, including timing of payment" in determining whether a

17   proposed settlement is "fair, reasonable, and adequate").  At the same time, the court "ha[s] an

18   independent obligation to ensure that the award, like the settlement itself, is reasonable, even if

19   the parties have already agreed to an amount."  *Bluetooth*, 654 F.3d at 941; *see also Briseño*, 998

20   F.3d at 1024 ("[T]he new Rule 23(e) makes clear that courts must balance the 'proposed award of

21   attorney's fees' vis-à-vis the 'relief provided for the class' in determining whether the settlement

22   is 'adequate' for class members."); *Zucker v. Occidental Petroleum Corp.*, 192 F.3d 1323, 1328–

23   29 (9th Cir. 1999).  Where, as here, fees are to be paid from a common fund, the relationship

24   between the class members and class counsel "turns adversarial."  *In re Wash. Pub. Power Supply*

25   *Sys. Sec. Litig.*, 19 F.3d 1291, 1302 (9th Cir. 1994).  As a result, the district court must assume a

26   fiduciary role for the class members in evaluating a request for an award of attorneys' fees from

27   the common fund.  *Id.*; *see also Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 968 (9th Cir. 2009).

28   /////

25

The Ninth Circuit has approved two methods for determining attorneys' fees in cases where the fee award is taken from the common fund set aside for the entire settlement: the "percentage of the fund" method and the "lodestar" method. *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Cir. 2002) (citations omitted). The district court retains discretion in common fund cases to choose either method. *Id.*; *Vu v. Fashion Inst. of Design & Merch.*, No. cv 14-08822 SJO (EX), 2016 WL 6211308, at *5 (C.D. Cal. Mar. 22, 2016). Under either approach, "[r]easonableness is the goal, and mechanical or formulaic application of either method, where it yields an unreasonable result, can be an abuse of discretion." *Fischel v. Equitable Life Assurance Soc'y of U.S.*, 307 F.3d 997, 1007 (9th Cir. 2002).

Under the percentage of the fund method, the court may award class counsel a given percentage of the common fund recovered for the class. *Id.* In the Ninth Circuit, a 25 percent award is the "benchmark" percentage for attorneys' fees. *See Bluetooth*, 654 F.3d at 947 (setting a 25 percent benchmark); *Staton*, 327 F.3d at 952 (same); *Six (6) Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990) (same). An explanation is necessary when the district court departs from the 25 percent benchmark. *Powers v. Eichen*, 229 F.3d 1249, 1256–57 (9th Cir. 2000).

Plaintiffs bring various state law claims and, under California law, "[t]he primary method for establishing the amount of reasonable attorney fees is the lodestar method." *In re Vitamin Cases*, 110 Cal. App. 4th 1041, 1053 (2003) (internal quotation marks and citations omitted). Under that method, the court determines the lodestar amount by multiplying a reasonable hourly rate by the number of hours reasonably spent litigating the case. *See Ferland v. Conrad Credit Corp.*, 244 F.3d 1145, 1149 (9th Cir. 2001). The product of this computation, the "lodestar" amount, yields a presumptively reasonable fee. *See Gonzalez v. City of Maywood*, 729 F.3d 1196, 1202 (9th Cir. 2013); *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 978 (9th Cir. 2008). The Ninth Circuit has recommended that district courts apply one method but cross-check the appropriateness of the amount by employing the other as well. *See Bluetooth*, 654 F.3d at 944.

Here, the proposed settlement provides that class counsel will seek an award of $840,000, which is 35 percent of the settlement amount. (Ex. 3, Hefelfinger Decl., Doc. No. 30-1 at 79.)

26

1    This is higher than the 25 percent benchmark for the Ninth Circuit, *Bluetooth*, 654 F.3d at 942,

2    but not at all uncommon for wage-and-hour class actions in the Eastern District of California and

3    elsewhere. *Barbosa v. Cargill Meat Sols. Corp.*, 297 F.R.D. 431, 450 (E.D. Cal. 2013) (listing

4    cases where courts approved attorneys' fees of about one-third of the total settlement); *see, e.g.*,

5    *Castro v. Paragon Indus., Inc.*, No. 1:19-cv-00755-DAD-SKO, 2020 WL 1984240, at *15–16

6    (E.D. Cal. Apr. 27, 2020) (preliminarily approving an award of 35 percent of the gross settlement

7    fund).

8          Here, plaintiffs' counsel asserts that the amount sought in attorney's fees here is

9    appropriate considering the time and effort expended by counsel, the contingency fee basis of the

10   representation, the substantial size of the proposed settlement, and the relative strengths and

11   weaknesses of the claims.  (Doc. No. 34 at 13 (identifying the Supreme Court's decision in

12   *Newton* and subsequent adverse rulings as examples of significant risks in this litigation); Supp.

13   Hefelfinger Decl., Doc. 34-1 ¶ 12.)  Additionally, this "action was commenced in June of 2015,

14   and has been heavily litigated in both state and federal court since that time, including substantive

15   and procedural motion practice, deposition discovery, and multiple mediation sessions."  (Supp.

16   Hefelfinger Decl., Doc. No. 34-1 ¶ 13.)  Plaintiffs' counsel estimates that "[a]pproximately 600

17   hours and close to $15,000 in out-of-pocket expenses have been devoted to litigating the case for

18   almost six years[,]" and that "an additional 100 hours may be expended over the course of the

19   next year by the two proposed class counsel firms, through final approval phase, monitoring the

20   2-step funding process that is being utilized in this matter, and communicating with class

21   members all the while."  (*Id.* ¶ 14.)

22         For purposes of preliminary approval, the court is satisfied with the justifications provided

23   by plaintiffs' counsel in the supplemental briefing that a departure from the 25 percent benchmark

24   is warranted here.  In connection with final approval, however, the court will again examine the

25   award of attorneys' fees, and plaintiffs' counsel is directed to provide the court with the necessary

26   records to allow the court to conduct a lodestar cross-check at that time.

27   /////

28   /////

1

           c.    *Enhancement Awards*

2           While incentive awards are "fairly typical in class action cases," they are discretionary

3  sums awarded by the court "to compensate class representatives for work done on behalf of the

4  class, to make up for financial or reputational risk undertaken in bringing the action, and,

5  sometimes, to recognize their willingness to act as a private attorney general." *West Publ'g*

6  *Corp.*, 563 F.3d at 958–59; *Staton*, 327 F.3d at 977 ("[N]amed plaintiffs . . . are eligible for

7  reasonable incentive payments.").  Such payments are to be evaluated individually, and the court

8  should look to factors such as "the actions the plaintiff has taken to protect the interests of the

9  class, the degree to which the class has benefitted from those actions, . . . the amount of time and

10  effort the plaintiff expended in pursuing the litigation . . . and reasonabl[e] fear[s of] workplace

11  retaliation." *Staton*, 327 F.3d at 977 (quoting *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir.

12  1998)).

13           Here, plaintiffs seek two enhancement awards.[8]  First, plaintiff Newell seeks an

14  enhancement award of $35,000 which is approximately 1.5% of the overall settlement amount.

15  (Ex. 3, Hefelfinger Decl., Doc. No. 30-1 at 80.)  He estimates that he has spent in excess of 275

16  hours over five years of litigation beginning in June 2015.  (Newell Decl., Doc. No. 30-2 ¶ 25.)

17  In support of his requested award, plaintiff Newell declares that he:  (1) spoke with or emailed

18  class counsel about the litigation, on average, at least once every few weeks or more frequently

19  depending on litigation or negotiation events, to obtain updates and to provide insight;

20  (2) traveled to Bakersfield, California, for two mediation sessions and incurred personal travel

21  expenses; (3) actively participated in all three mediation sessions and in discussions regarding the

22  claims and defenses; and (4) reviewed evidence, transcripts, pleadings, motions, other briefs,

23  declarations, deposition outlines, discovery requests and responses, and the stipulation of

24  settlement.  (*Id.* ¶¶ 20–26.)  Furthermore, plaintiff Newell states that he risked his personal assets

25

26      [8]  "If the Court approves an enhancement of less than the amounts requested for the Named
Plaintiffs, then the unapproved portion or portions shall revert into the Net Settlement Amount to
be distributed between the participating Settlement Class members on a pro-rata basis.  This

27  settlement is not conditional upon any specific amount being awarded as an enhancement to the
Named Plaintiffs."  (Ex. 3, Hefelfinger Decl., Doc. No. 30-1 at 80.)

28

1    "because [his] fee agreement with Class Counsel obligates [him] to pay litigation costs and there

2    was always the risk that [he] would have to pay Defendant's costs if [they] lost the case."  (*Id.* ¶

3    29.)

4          Second, plaintiff Calderon seeks an enhancement award of $25,000, which is

5    approximately 1% of the overall settlement amount.  (Ex. 3, Hefelfinger Decl., Doc. No. 30-1 at

6    80.)  Plaintiff Calderon estimates that he has spent in excess of 150 hours over two years of

7    litigation beginning in early 2019.  (Calderon Decl., Doc. No. 30-3 ¶ 25.)  In support of his

8    requested incentive award, plaintiff Calderon declares that he:  (1) spoke with or emailed class

9    counsel about the litigation, on average, at least once every few weeks or more frequently

10   depending on litigation or negotiation events, to obtain updates and to provide insight; (2)

11   actively participated in the September 2020 mediation session, which took place on Zoom, and in

12   discussions about the claims and defenses; and (3) reviewed evidence, transcripts, pleadings,

13   motions, other briefs, declarations, deposition outlines, discovery requests and responses, and the

14   stipulation of settlement.  (*Id.* ¶¶ 20–26.)  Plaintiff Calderon also states that he risked his personal

15   assets "because [his] fee agreement with Class Counsel obligates [him] to pay litigation costs and

16   there was always the risk that [he] would have to pay Defendant's costs if [they] lost the case."

17   (*Id.* ¶ 29.)  Finally, plaintiff Calderon states that he was "laid off by [defendant] *during the*

18   *pendency of the case*," and believes that his "layoff was, at least in part, due to mention of [his]

19   name as a named plaintiff in the action starting in 2019."[9]  (*Id.* ¶ 27 (emphasis in original).)

20   /////

21

22   ───────────────────
     [9]  Plaintiffs' counsel Brian D. Hefelfinger also provides the following support in favor of the
     requested enhancement awards:

23
24            This case has taken longer and required more time of the class
              representative(s) . . . as it was filed back in 2015 and has involved
              much more motion work, discovery and deposition work, and more
25            mediation sessions, all of which both counsel and the class
              representative(s) have participated in.

26
     (Supp. Hefelfinger Decl., Doc. No. 34-1 ¶ 16; *see also id.* ¶ 15 (citing *Fuller v. Zep, Inc.*, N.D.
27   Cal. Case No. 4:18-cv-02672-JSW, where "the court awarded the class representative a $30,000
     incentive award for recovering a $1.5M fund on behalf of approximately 289 workers.").)
28

1    Incentive awards of $35,000 and $25,000 amount to approximately 2.5 percent of the

2    overall settlement amount of $2,400,000.  In comparison, the calculations provided in the parties'

3    joint supplement brief estimate that participating class members will receive between $4.70 and

4    $41,097.98, and participating FLSA collective members will receive between $0.78 and

5    $6,820.51, based on each member's hours worked.[10]  (Supp. Hefelfinger Decl., Doc. No. 34-1 ¶

6    33 (stating "the average settlement payment for state claims would be $3,948.00" and "the

7    average FLSA Payment would be $655.20"); *see also id.* ¶¶ 34–35 (providing examples of the

8    estimated total payments a long-term employee ($35,000) and short-term employee ($5,000)

9    would receive).)

10    While incentive awards of $35,000 and $25,000 are substantially higher than the average

11    amount a class member could expect to receive, these awards may also be lower than the

12    maximum amount some class members may receive.  However, such awards are still larger than

13    those generally awarded by the courts.  *See, e.g.*, *Aguilar v. Wawona Frozen Foods*, No. 1:15-cv-

14    00093-DAD-EPG, 2017 WL 2214936, at *8 (E.D. Cal. May 19, 2019) (and cases cited therein);

15    *Ontiveros v. Zamora*, 303 F.R.D. 356, 365–66 (E.D. Cal. Oct. 8, 2014) (approving enhancement

16    award of $15,000 where class representative spent 271 hours over six years on the case and the

17    average class member award of $3,700); *Wise v. Ulta Salon, Cosms. & Fragrance, Inc.*, No. 1:17-

18    cv-00853-DAD-EPG, 2019 WL 3943859, at *11 (E.D. Cal. Aug. 21, 2019) (approving $10,000

19    incentive awards each to two class representatives, which amounted to 0.6 percent of the overall

20    settlement amount of $3,400,000); *Arredondo v. Delano Farms Co.*, Case No. 1:09-cv-01247-

21    MJS, 2017 WL 4340204, at *2–3 (E.D. Cal. Sept. 29, 2017) (reducing five enhancement awards

22    from the requested $25,000 each to $7,000 each).  *But see Glass*, 2007 WL 221862, at *16–17

23    (approving requested incentive awards of $25,000 to each of the four class representatives out of

24    total settlement amount of $45,000,000).

25

26    [10]  "The calculations also show that the average number of hours per settlement class member for
     this claims period at the time of mediation was around 1680 hours.  The highest number of hours
27    per class member was 17,488.5 and the lowest number of hours was 2 hours."  (Supp. Hefelfinger
     Decl., Doc. No. 34-1 ¶ 33; *see also* Doc. No. 34 at 24–25, 26 (finding 509,131 total hours during
28    the claims period).)

1      Furthermore, the combined enhancement awards sought by plaintiffs would make up 2.5

2  percent of the total settlement amount of $2,400,000, which is also unusually high.  *See, e.g.*,

3  *Monterrubio v. Best Buy Stores, L.P.*, 291 F.R.D. 443, 463 (E.D. Cal. 2013) (finding that a

4  proposed incentive payment of $7,500 was excessive where it comprised 1.8 percent of total

5  settlement amount ($400,000) and the average class member's share of the settlement was

6  $65.79); *Ko v. Natura Pet Prods., Inc.*, Civ. No. 09-2619 SBA, 2012 WL 3945541, at *15 (N.D.

7  Cal. Sept. 10, 2012) (holding that an incentive award of $20,000, comprising one percent of the

8  approximately $2,000,000 common fund was "excessive under the circumstances" and reducing

9  the award to $5,000); *Brecher v. Citigroup Glob. Mkts., Inc.*, CASE NO. 09-cv-1344-CAB

10  (MDD), 2015 WL 13344782, at *4–5 (S.D. Cal. Feb. 6, 2015) (finding that a requested incentive

11  awards of $25,000 each to three class representatives, which amounted to two percent of the

12  $3,700,000 settlement fund, exceeded common incentive awards and reducing those awards to

13  $10,000 each); *Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245, 267–68 (N.D. Cal. 2015)

14  (finding that the requested incentive award of $20,000, which was two percent of the gross

15  settlement award of $1,00,000, was high and decreasing the award to $15,000).

16      Having reviewed the proposed $35,000 and $25,000 enhancement awards, respectively,

17  the court notes that the amounts requested may be disproportionate given the possible disparity

18  with the settlement's average or median award of $3,948.  However, the court gives some weight

19  to the evidence submitted by the parties indicating that the named plaintiffs, particularly plaintiff

20  Newell, have taken on considerable risk and have dedicated to this litigation an unusual amount

21  of time.  Accordingly, the court will preliminarily approve the enhancement awards on the

22  condition that plaintiffs demonstrate in detail the nature of those risks and commitments and

23  provide clear comparisons that enable the court to determine the extent to which those awards in

24  fact may dwarf the average or median award received by the Rule 23 class and FLSA collective

25  members in cases similar to this one.  *See Radcliffe v. Experian Info. Sols. Inc.*, 715 F.3d 1157,

26  1163 (9th Cir. 2013) (urging district courts to be "vigilant in scrutinizing all incentive awards to

27  determine whether they destroy the adequacy of the class representatives.") (citation omitted).

28  /////

d.     *Release of Claims*

As part of this proposed settlement, the released claims are limited to "all state Class Claims against any of the Released Parties[11] arising in the Settlement Period that were alleged in the Litigation or that could have been raised based on the facts alleged in the Litigation or Complaint."  (Ex. 3, Hefelfinger Decl., Doc. No. 30-1 at 65–66; *see id.* at 57–58 (listing class claims).)  All settlement class members who do not opt out will be deemed to have released defendant from the released claims.  (*Id.* at 65–66.)  For members of the FLSA collective, FLSA claims will only be released for those who affirmatively opt in.  (*Id.* at 66.)  The release therefore appropriately tracks the claims at issue in this case.

**D.     Proposed Class Notice and Administration**

For proposed settlements under Rule 23, "the court must direct notice in a reasonable manner to all class members who would be bound by the proposal."  Fed. R. Civ. P. 23(e)(1); *see also Hanlon*, 150 F.3d at 1025 ("Adequate notice is critical to court approval of a class settlement under Rule 23(e).").  For a class certified under Rule 23(b)(3), the notice must contain, in plain and clear language:  (1) the nature of the action; (2) the definition of the class certified; (3) the class claims, issues, or defenses; (4) that a class member may appear through an attorney if desired; (5) that the court will exclude members who seek exclusion; (6) the time and manner for requesting an exclusion; and (7) the binding effect of a class judgment on members of the class.  Fed. R. Civ. P. 23(c)(2)(B).  A class action settlement notice "is satisfactory if it generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard."  *Churchill Vill., LLC v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004) (internal quotation marks and citations omitted).

---

[11]  The settlement agreement defines the term "released parties" as:

> (i) [defendant] and its past, present, and future parents, subsidiaries, affiliates, divisions, joint ventures, licensees, franchisees, and any other legal entities, whether foreign or domestic, and (ii) the past, present, and future shareholders, officers, directors, members, investors, agents, employees, consultants, representatives, fiduciaries, insurers, attorneys, legal representatives, predecessors, successors, and assigns of the entities listed in (i).

(Ex. 3, Hefelfinger Decl., Doc. No. 30-1 at 61.)

1        Additionally, for proposed settlements under the FLSA, "the court [must] provide

2    potential plaintiffs 'accurate and timely notice concerning the pendency of the collective action,

3    so that they can make informed decisions about whether or not to participate.'" *Adams v. Inter–*

4    *Con Sec. Sys.*, 242 F.R.D. 530, 539 (N.D. Cal. 2007) (quoting *Hoffmann–La Roche v. Sperling*,

5    493 U.S. 165, 170 (1989)); *see generally* 29 U.S.C. § 216(b) ("No employee shall be a party

6    plaintiff to any such action unless he gives his consent in writing to become such a party and such

7    consent is filed in the court in which such action is brought.").

8        Here, the proposed settlement provides that, within ten days of preliminary approval, the

9    claims administrator will receive the following information about each settlement class member:

10   (1) name, (2) last known home address, (3) last known phone number, (4) Social Security

11   number, and (5) eligible hours worked during the relevant claim period ("Class List").  (Ex. 3,

12   Hefelfinger Decl., Doc. No. 30-1 at 68.)  The claims administrator will run the addresses provided

13   through the United States Postal Service NCOA database to obtain current address information

14   and subsequently mail the notice packets via first-class regular U.S. Mail within 25 days.

15   (*Id.* at 70.)  Plaintiffs assert that the class notice's contents meet the requirements of Rule 23 and

16   provide additional information, including:[12]

> 17    the nature of the Litigation; a summary of the terms of the Settlement;
> 18    the definition of the Settlement Class; a statement that the Court has
>      preliminarily approved the Settlement; the nature and scope of the
>      claims being released; the procedure and time period for objecting to
> 19    the Settlement[;] the date and location of the Final Approval hearing;
> 20    information regarding the opt-out procedure; instructions for
>      submitting FLSA Claim Forms; instructions for submitting Work
> 21    Hours Dispute Forms; and Defendant's determination of hours
>      worked on offshore platforms and as members of the putative class
> 22    within the relevant Claim Period from the payroll records.

23   (*Id.*; *see* Ex. 5, Supp. Hefelfinger Decl., Doc. No. 34-1 at 37–47.)

24        Additionally, plaintiffs propose a FLSA notice separate from the class notice, although the

25   class and FLSA documents will be sent in one packet.  (Ex. 3, Hefelfinger Decl., Doc. No. 30-1

26

27   [12]  In response to the court's order, the parties corrected the proposed class notice to reflect that

28   the final approval hearing will be held before this court in Fresno, California.  (Doc. No. 34 at
    27–28; Ex. 5, Supp. Hefelfinger Decl., Doc. No. 34-1 at 38.)

at 60, 101–03.)  The settlement class members will receive a consent to join/opt-in form.  (*Id.* at

72, 101–03.)  The court finds that plaintiffs' proposed notices provide sufficient information to

allow the putative class and collective members to make an informed decision about whether to

opt-out of the class or opt-in to the collective.

Plaintiffs also propose the following implementation schedule:

| Date | Event |
|---|---|
| No later than ten (10) days of the date of entry of this order | Defendants' counsel will provide the claims administrator with the Class List. |
| No later than twenty-five (25) days after the claims administrator receives the Class List ("Notice Date") | The settlement administrator will mail to all settlement class members:  (1) the class notice; (2) FLSA claim form; (3) work hours dispute form; (4) request to be excluded; and (5) self-addressed, stamped return envelope. |
| Thirty (30) days from Notice Date | The settlement administrator will mail to those settlement class members who have not responded to the notice a reminder post-card encouraging them to respond before the deadline. |
| Sixty (60) days from Notice Date | • Deadline to mail FLSA consent to join/opt-in form.<br><br>• Deadline to mail dispute form to dispute number of eligible work hours listed on the form, on which the estimated settlement payment and, if applicable, FLSA settlement payment are based.<br><br>• Deadline to mail written objections.<br><br>• Deadline to mail request for exclusion. |
| To be announced in a subsequent court order. | Final fairness hearing and hearing on motion for final approval, award of attorneys' fees and costs and class representative enhancement awards. |
| Ten (10) days following Effective Date[13] | Defendant will deposit $1,470,000 into an interest-bearing trust account established by the settlement administrator |

---

[13]  "Effective Date" is defined in the settlement agreement as follows:

> (1) the date of final affirmation of the Final Approval from any appeal, writ, or other appellate proceeding opposing the Final Approval, the expiration of the time for, or the denial of, a petition to review the Final Approval, or if review is granted, the date of final affirmation of the Final Approval following review pursuant to that grant; or (2) the date of final dismissal of any appeal from the Final Approval or the final dismissal of any proceeding to review the Final Approval, provided that the Final Approval is affirmed and/or not

34

| | ("Initial Settlement Payment"). |
|---|---|
| Within fifteen (15) days following the date of the Initial Settlement Payment | The settlement administrator will mail the (1) Net Settlement Payments to the Settlement Class, (2) court-approved enhancement payments to the named plaintiffs, and (3) administration costs. |
| No later than three (3) months following the date of the Initial Settlement Payment | Defendants will deposit $930,000 to the interest-bearing account established by the settlement administrator ("Final Settlement Payment"). |
| Within fifteen (15) days following the date of the Final Settlement Payment | The settlement administrator will mail all remaining settlement payments, including:  (1) court-approved attorneys' fees and litigation costs and (2) court-approved PAGA payment to the LWDA. |

(*Id.* at 68–75, 77–78.)

The court finds that the notice and the manner of notice proposed by plaintiffs meet the requirements of Rule 23(c)(2)(B) and 29 U.S.C. § 216(b), and that the proposed mail delivery is also appropriate under these circumstances.

## CONCLUSION

For the reasons stated above,

1. Plaintiffs' motion for preliminary approval of class action settlement (Doc. No. 30) is GRANTED;

2. Plaintiffs' counsel, Daniel J. Palay and Brian D. Hefelfinger, are appointed as class counsel;

3. The named plaintiffs, Louis Newell and Miguel Calderon, are appointed as class representatives;

/////

reversed in any part; or (3) if no appeal, writ, or other appellate proceeding opposing the Final Approval is filed, the expiration date of the time for the filing or noticing of any appeal from the Court's Final Approval of the Settlement.  In the event there is a timely filed motion to set aside judgment or to intervene, the expiration of the period for filing any appeal, writ, or other appellate proceeding opposing the Final Approval will be based on the date of the Court's ruling or order on any such motion or the date of Final Approval, whichever is later.

(*Id.* at 59.)

4.      The proposed notice and claim form conform with Federal Rule of Civil Procedure 23 and 29 U.S.C. § 216(b) and are approved;

5.      CPT Group, Inc., is approved as claims administrator;

6.      The proposed settlement detailed herein is approved on a preliminary basis as fair, reasonable, and adequate;

7.      The hearing for final approval of the proposed settlement will be set in a subsequent order of the court[14], with the motion for final approval of class action settlement to be filed twenty-eight (28) days in advance of the final approval hearing, in accordance with Local Rule 230; and

8.      Plaintiffs' proposed settlement implementation schedule is adopted.

IT IS SO ORDERED.

Dated:   __**December 20, 2021**__             _____

                                             UNITED STATES DISTRICT JUDGE

---

[14] Based upon Jennifer L. Thurston's recent confirmation to be a District Judge in the Eastern District of California, this matter is likely to be reassigned in the coming weeks. Once that reassignment occurs, the court will set a final confirmation hearing date. The court anticipates that the hearing date will be available in time for the settlement administrator to include the date, time, and location in the class notice

36