1
2
3
4
5
6
7

**UNITED STATES DISTRICT COURT**

8
9

**EASTERN DISTRICT OF CALIFORNIA**

10

| | |
|---|---|
| LOUIS NEWELL, an individual, for himself and those similarly situated; MIGUEL CALDERON, an individual for himself and those similarly situated, | Case No. 1:19-cv-01314-JLT-BAK |
| Plaintiffs, | ORDER GRANTING PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND GRANTING IN PART PLAINTIFFS' MOTION FOR ATTORNEYS' FEES |
| v. | |
| ENSIGN UNITED STATES DRILLING (CALIFORNIA) INC., a California corporation, | (Doc. 43; Doc. 44) |
| Defendant. | |

11
12
13
14
15
16
17
18

19    Before the Court is the Plaintiffs' Louis Newell and Miguel Calderon, on behalf of

20  themselves and those similarly situated, motion for final approval of the proposed class action

21  settlement. (Doc. 44.) In addition, Plaintiffs filed a motion for award of attorneys' fees pursuant

22  to the terms of the proposed settlement. (Doc. 43.) Having reviewed the motions, attached

23  declarations, and proposed settlement the Court hereby **GRANTS** the motion for final approval

24  of the class action settlements and **GRANTS IN PART** the motion for attorneys' fees.

25                    **I.    BACKGROUND**

26    On December 20, 2021, the Court granted preliminary approval of the settlement which

27  resolves the claims asserted this class action and FLSA collective action, involving various

28  employment violations. (Doc. 38.) Pertinent factual details may be found in that order and will

1   not be repeated here. Following the grant of preliminary approval, in January 2022, CPT Group,

2   Inc. acting as the claims administrator sent a class notice to all settlement class members. (Doc.

3   44 at 12; Doc. 44-5 at 5-20 (Class Notice).) The claims administrator mailed 298 notices, and 6

4   were returned as undeliverable with no forwarding address. (Doc. 44 at 12.) The deadline to opt

5   out of or object to the settlement was March 25, 2022. (*Id.*) None of the class members objected

6   to the settlement and only one affirmatively opted out of the settlement. (*Id.*) In accordance with

7   FLSA settlement requirements, 112 of participating class members filed a timely FLSA Claim

8   Form, resulting in a 37.58 percent participation rate. (Doc. 44-5 at 4, ¶ 19.)

9        The proposed settlement awards a total of $2,400,000. (Doc. 30-1 at 61 (Proposed

10  Settlement).) Of this amount, $100,000 is allocated to the PAGA claims, with $75,000 awarded to

11  the State of California's Labor and Workforce Development Agency (LWDA) and $25,000

12  awarded to the class members on a pro rata basis. (*Id.* at 60-61.) In addition, $200,000 of the total

13  is attributed to the FLSA claims. (*Id.* at 60.) Based on the responses to the settlement notice, the

14  claims administrator attests that the average FLSA payment will be $1,135.34. (Doc. 44-5 at 4,

15  ¶ 16.) The remaining settlement amount, excluding attorneys' fees and costs, will be distributed

16  to class members on a pro rata basis, with the average member receiving $4,028.62. (*Id.* at 3,

17  ¶ 15.) Plaintiffs request $840,000 in attorneys' fees, which amounts to 35 percent of the total

18  settlement amount, and $12,741.47 in litigation costs. (Doc. 43 at 7.)

19              **II.    FINAL CERTIFICATION OF CLASS ACTION**

20       The Court evaluated the standards for class certification in its prior order granting

21  preliminary approval of the settlement and found certification warranted. (Doc. 38 at 12-18.)

22  Because no additional issues concerning class certification have been raised, the Court finds no

23  basis to revisit the analysis contained its prior order. (*See* Doc. 44 at 13.) Accordingly, the Court

24  finds that final class certification in this case, for the purposes of settlement, is appropriate. The

25  following class is therefore certified:

26       All non-exempt employees of [defendant] who, at any time between June 22, 2011
         and the present (the "Claims Period"), worked and stayed on oil platforms off of
27       the California coast for periods of 24 consecutive hours or more any time during
         the Claims Period.

28

1  (Doc. 30-1 at 61.) This settlement class expressly excludes any individuals who submitted a valid

2  and timely request for exclusion from the settlement. (*Id.* at 65.) The FLSA collective is nearly

3  identical to the defined class, and the Court also certifies the FLSA collective. (*See* Doc. 44-6 at

4  2.) In addition, named plaintiffs Louis Newell and Miguel Calderon are confirmed as class

5  representatives. Plaintiffs' counsel, Daniel J. Palay, Esq., and Brian D. Hefelfinger, Esq. of Palay

6  Hefelfinger, APC and Michael A. Strauss of Strauss & Strauss APC are confirmed as Class

7  Counsel. (*See* Doc. 30 at 2.) CPT Group, Inc. is confirmed as the claims administrator.

8  ### III.   FINAL APPROVAL OF CLASS ACTION SETTLEMENT

9        Class actions require the approval of the district court prior to settlement. Fed. R. Civ. P.

10  23(e) ("The claims, issues, or defenses of a certified class—or a class proposed to be certified for

11  purposes of settlement—may be settled, voluntarily dismissed, or compromised only with the

12  court's approval."). Final settlement approval requires: (i) the parties to send adequate notice to

13  all class members; (ii) the court to make a finding that the settlement is fair, reasonable, and

14  adequate; (iii) the parties to file a statement identifying the settlement agreement; and (iv) class

15  members to have an opportunity to object. Fed. R. Civ. P. 23(e)(1)-(5). Plaintiffs previously

16  submitted the proposed settlement agreement with its motion for preliminary approval (Doc. 30-1

17  (Joint Stipulation of Class Action Settlement and Release)), and the parties affirmed that class

18  members have been given an opportunity to object (Doc. 44-5 at 2-4). The Court now turns to the

19  adequacy of notice and reviews the settlement for a final fairness determination.

20  **A.   Notice**

21        "Adequate notice is critical to court approval of a class settlement under Rule 23(e)."

22  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1025 (9th Cir. 1998). "Notice is satisfactory if it

23  'generally describes the terms of the settlement in sufficient detail to alert those with adverse

24  viewpoints to investigate and to come forward and be heard.'" *Churchill Vill., L.L.C. v. Gen.*

25  *Elec.*, 361 F.3d 566, 575 (9th Cir. 2004) (quoting *Mendoza v. Tucson Sch. Dist. No. 1*, 623 F.2d

26  1338, 1352 (9th Cir. 1980)). Any settlement notice provided to the class should alert members of

27  "the opportunity to opt-out and individually pursue any state law remedies that might provide a

28  better opportunity for recovery." *Hanlon*, 150 F.3d at 1025. The class settlement notice should

1    also include information concerning the attorneys' fees to be awarded from the settlement,

2    because it serves as "adequate notice of class counsel's interest in the settlement." *Staton v.*

3    *Boeing Co.*, 327 F.3d 938, 963 n.15 (9th Cir. 2003) (quoting *Torrisi v. Tucson Elec. Power Co.*, 8

4    F.3d 1370, 1375 (9th Cir. 1993)) (notices with only indirect references to attorneys' fees require

5    courts to be "all the more vigilant in protecting the interests of class members with regard to the

6    fee award").

7          CPT Group, Inc., the claims administrator, mailed notices to the stipulated class in

8    January 2022, with a deadline to respond, object, or opt out of the proposed settlement by March

9    25, 2022. (Doc. 44-5 at 3.) Only 6 of the 298 notices were returned as undeliverable, which

10   means the rate of success in delivering notice to class members was 99.66 percent. (Doc. 44 at

11   12.) The notice sent to class members includes an explanation of the case, claims, and the parties'

12   respective positions. (Doc. 44-5 at 6-20.) The notice identifies the named plaintiffs, class counsel

13   representing the class, and the claims administrator. (*Id.*) It also provides a detailed explanation of

14   the proposed settlement, including: the total award; the method for determining the pro rata basis

15   for each class member's individual award; how taxes would affect the award; proposed awards

16   for the named plaintiffs; the upper cap of 35 percent to be awarded in attorneys' fees; and the

17   binding effect and release of claims. (*Id.*) In addition, the notice explains the opt-in and opt-out

18   procedures and includes the proper forms to complete those processes. (*Id.*)

19         Given the above, the Court concludes adequate notice was provided to the vast majority of

20   the class here. *Silber v. Mabon*, 18 F.3d 1449, 1453-54 (9th Cir. 1994) (noting the court need not

21   ensure all class members receive actual notice, only that "best practicable notice" is given);

22   *Winans v. Emeritus Corp.*, 2016 WL 107574, at *3 (N.D. Cal. Jan. 11, 2016) ("While Rule 23

23   requires that 'reasonable effort' be made to reach all class members, it does not require that each

24   individual actually receive notice."). The Court accepts the information attested to by the claims

25   administrator (Doc. 44-5 at 1-4) and finds sufficient notice has been provided to satisfy Federal

26   Rule of Civil Procedure 23(e)(1).

27   **B.    Final Fairness Determination**

28         On April 21, 2022, Plaintiffs filed a motion for final approval of the settlement, including

4

supporting declarations from Michael A. Strauss and Brian Hefelfinger as class counsel (Doc. 44-1; Doc. 44-2); from named plaintiffs Louis Newell and Miguel Calderon (Doc. 44-3; Doc. 44-4); and from Jeremy Talavera on behalf of CPT Group, Inc., the claims administrator (Doc. 44-5). On May 13, 2022, the Court vacated the hearing for final settlement approval because no objections were filed in opposition to the settlement. (Doc. 47.) The Court, therefore, now determines whether the settlement is fair, adequate, and reasonable on the papers. *See* Fed. R. Civ. P. 23(e)(2).

In assessing the fairness of a class action settlement, courts balance the following factors:

> (1) the strength of the plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members to the proposed settlement.

*Churchill Vill.*, 361 F.3d at 575; *see also In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 944 (9th Cir. 2015); *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 963 (9th Cir. 2009). These factors guide the Court's analysis, but they are non-exclusive, and the Court need not discuss factors irrelevant to a particular case. *Churchill Vill.*, 361 F.3d at 576 n.7. Although the Ninth Circuit recognizes that "strong judicial policy . . . favors settlements," (*Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992)), if the parties reach a settlement agreement prior to class certification, the Court must evaluate the agreement for any sign of collusion among the negotiating parties. *See In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011) (noting "settlement class actions present unique due process concerns for absent class members" because the "inherent risk is that class counsel may collude with the defendants, tacitly reducing the overall settlement in return for a higher attorney's fee") (internal quotation marks and citations omitted).

In particular, where the parties reach a class action settlement agreement prior to the Court certifying the class, "consideration of these eight *Churchill* factors alone is not enough to survive appellate review." *In re Bluetooth*, 654 F.3d at 946. District courts must be watchful "not only for

explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations." *Id.* at 947. These more subtle signs include: (i) "when counsel receive a disproportionate distribution of the settlement, or when the class receives no monetary distribution but class counsel are amply rewarded"; (ii) the existence of a "clear sailing" arrangement, which provides "for the payment of attorneys' fees separate and apart from class funds," and therefore carries "the potential of enabling a defendant to pay class counsel excessive fees and costs in exchange for counsel accepting an unfair settlement on behalf of the class"; and (iii) "when the parties arrange for fees not awarded to revert to defendants rather than be added to the class fund." *Id.* (internal citations and quotation marks omitted). A version of a "clear sailing" arrangement exists when a defendant expressly agrees not to oppose an award of attorneys' fees up to a certain amount. *In re Bluetooth*, 654 F.3d at 947; *In re Toys R Us-Delaware, Inc.–Fair and Accurate Credit Transactions Act (FACTA) Litig.*, 295 F.R.D. 438, 458 (C.D. Cal. 2014) ("In general, a clear sailing agreement is one where the party paying the fee agrees not to contest the amount to be awarded by the fee-setting court so long as the award falls beneath a negotiated ceiling.") (quoting *Weinberger v. Great N. Nekoosa Corp.*, 925 F.2d 518, 520 n.1 (1st Cir. 1991)).

Though the Court has wide latitude to determine whether a settlement is substantively fair, it is held to a higher procedural standard and "must show it has explored comprehensively all factors, and must give a reasoned response to all non-frivolous objections." *Allen v. Bedolla*, 787 F.3d 1218, 1223-24 (9th Cir. 2015) (quoting *Dennis v. Kellogg Co.*, 697 F.3d 858, 864 (9th Cir. 2012)). Thus, the Court should examine any relevant *Churchill* factors, but the failure to review a pre-class certification settlement for those subtle signs of collusion identified above may constitute error. *Id.* at 1224-25.

1. Strength of Plaintiffs' Case

To assess the strength of Plaintiffs' case, the Court should not draw "ultimate conclusions regarding the contested issues of fact and law that underlie the merits of th[e] litigation." *Criswell v. Boudreaux*, 2021 WL 5811887, at *5 (E.D. Cal. Dec. 7, 2021) (internal citation omitted). Rather, it must objectively evaluate the strengths and weakness of the merits of the parties' claims

6

1   and defenses and how those considerations impact the parties' decision to reach a settlement. *Id.*

2       Most significantly, the opinions recently issued in *Newton* and *Mauia* impacted the

3   strength of Plaintiffs' claims. *Parker Drilling Management Services, Ltd. v. Newton*, 139 S.Ct.

4   1881 (2019); *Mauia v. Petrochem Insulation, Inc.*, 5 F.4th 1068 (9th Cir. 2021). As explained by

5   the Court in its preliminary approval, the parties concede these precedents would eliminate, or at

6   the very least substantially undermine, the likelihood of success on Plaintiffs' principal claims.

7   (Doc. 38 at 24.) Plaintiffs' claims which would have yielded the highest potential recovery

8   involve state law claims for unpaid overtime. (*Id.*) The claims seek redress for unpaid overtime

9   for offshore workers located in both state and federal waters, and thus, depend in part on the

10  applicability of California wage laws to worked performed on hitches[1] in federal waters. (*Id.*)

11  Plaintiffs attest that approximately 80 percent of the hitches at issue were in federal waters. (Doc.

12  44 at 15.)

13      Plaintiffs' counsel represent that the decisions by the Supreme Court *Newton* and the

14  Ninth Circuit in *Mauia* likely preclude overtime claims under California law for work performed

15  in federal waters. (Doc. 44 at 15). As a result, only 20 percent of their overtime claims remain.

16  (*Id.*) These decisions directly impacted plaintiffs' case and "effectively vitiated the most valuable

17  of the Plaintiffs' theories of recovery." (Doc. 30 at 18.) Accordingly, Plaintiffs had a reasonably

18  strong incentive to pursue settlement negotiations to limit their litigation risks. In light of the

19  weakened status of Plaintiffs' case, the intervening preceded of *Newton* and *Mauia* suggest the

20  decision to pursue a settlement agreement was fair and reasonable.

21      2.   Risk, Expense, Complexity, Likely Duration of Further Litigation, and Maintaining

22          Class Action Status Throughout Trial

23      "[T]here is a strong judicial policy that favors settlements, particularly where complex

24  class action litigation is concerned." *In re Syncor ERISA Litig.*, 516 F.3d 1095, 1101 (9th Cir.

25  2008) (citing *Class Plaintiffs*, 955 F.2d at 1276). As a result, "[a]pproval of settlement is

26  'preferable to lengthy and expensive litigation with uncertain results.'" *Johnson v. Shaffer*, 2016

27

28

---

[1] As explained in the Court's preliminary approval, a hitch refers to the work period spent offshore. (Doc. 38 at 2.)

WL 3027744, at *4 (E.D. Cal. May 27, 2016) (citing *Morales v. Stevco, Inc.*, 2011 WL 5511767, at *10 (E.D. Cal. Nov. 10, 2011)). Class actions involving disputes of state and federal employment law are typically time-consuming and expensive to litigate. *Hightower v. JPMorgan Chase Bank, N.A.*, 2015 WL 9664959, at *6 (C.D. Cal. Aug. 4, 2015).

The discussion above related to the strengths and weaknesses of Plaintiffs' case also impacts the risk, complexity, and expense of maintaining the claims. The new precedent would likely require more extensive research and legal analysis increasing both the expense and complexity of this litigation. The parties have already expended six years litigating this case and would continue to incur more expenses if the Court does not approve the proposed settlement. (Doc. 34 at 12.) Moreover, the case involves both class action claims under state law, PAGA claims, and a collective action under FLSA, which further increases the complexity and expense of maintaining litigation through trial. (Doc. 44 at 10-11.)

Finally, the class action status is not guaranteed if the Court does not approve the settlement agreement. Ensign challenged the magistrate judge's findings and recommendations to certify the class (Doc. 26.) but Ensign stipulated to certification of the class for purposes of settlement *only*. (Doc. 30-1 at 61.) Therefore, if the Court does not grant final approval, Ensign could renew its objections to the magistrate judge's conclusions. The uncertainties as to class certification would further increase the complexity and costs associated with litigating this case. Therefore, these factors indicate that reaching a settlement at this stage of the litigation is fair and reasonable.

### 3.   Amount Offered in Settlement

The amount offered in the proposed settlement also suggests the parties' negotiations resulted in an adequate, fair, and reasonable agreement. The Court evaluates the potential recovery compared to the total proposed settlement. *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424-25 (1968). "It is well-settled law that a cash settlement amounting to only a fraction of the potential recovery does not per se render the settlement inadequate or unfair." *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000) (internal quotations omitted). To determine whether a settlement "falls within the range of

possible approval," a court must focus on "substantive fairness and adequacy," and "consider plaintiffs' expected recovery balanced against the value of the settlement offer." *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1079-80 (N.D. Cal. 2007).

Relative to the total potential recovery, Plaintiffs estimate the settlement amount of $2,400,000 correlates to a 38 percent recovery of their maximum potential damages ($5,800,000 (excluding attorneys' fees and interest)). (Doc. 34 at 26.) This settlement amount is within the range or exceeds percentage recoveries that California district courts have found to be reasonable and adequate. *See, e.g.*, *Benitez v. W. Milling, LLC*, 2020 WL 3412725, at *6 (E.D. Cal. June 22, 2020) (approving a recovery rate of approximately 13 percent); *Glass v. UBS Fin. Servs., Inc.*, 2007 WL 221862, at *4 (N.D. Cal. Jan. 26, 2007) (settlement of approximately 25 to 35 percent of the maximum potential value was found to be reasonable).

In addition, the proposed settlement reasonably allocates the award to the respective claims. For example, approximately 8 percent of the net settlement fund is awarded to the FLSA collective, which corresponds to the smaller potential recovery for FLSA claims relative to the other claims. (*See* Doc. 44 at 11 (explaining the FLSA claims arise from Ensign's alleged failure to value meals and lodging in the regular and overtime pay rate).) Plaintiffs estimate that the maximum recovery of FLSA damages would be approximately $500,000 to $1,000,000, making the allocated net settlement amount of $200,000 a 40 percent to 20 percent recovery of Plaintiffs' FLSA claim, respectively. (Doc. 34-1 at 5-6, ¶ 25 (stating that the amount of recovery "depend[s] on the statute of limitations applied, value of lodging, enforcement of arbitration agreements, etc.").) The court finds this aspect of the proposed settlement to be a fair and reasonable resolution of a bona fide dispute under the FLSA. *See Thompson v. Costco Wholesale Corp.*, 2017 WL 697895, at *8 (S.D. Cal. Feb. 22, 2017) ("[C]ourts that have approved settlements releasing both FLSA and Rule 23 claims generally do so only when the parties expressly allocate settlement payments to FLSA claims."); *see also Millan*, 310 F.R.D. at 602 (noting that "creation of separate settlement funds for the FLSA class and the Rule 23 class . . . would better protect absent class members"); *Khanna v. Inter-Con Sec. Sys., Inc.*, 2013 WL 1193485, at *2 (E.D. Cal. Mar. 22, 2013) (approving a hybrid settlement that allocated two-thirds of net settlement amount

1  to state claims and one-third of net settlement amount to FLSA claims); *Pierce v. Rosetta Stone,*
2  *Ltd.*, 2013 WL 1878918, at *3 (N.D. Cal. May 3, 2013) (same).

3       Finally, the proposed settlement's allocation for civil PAGA penalties, in the amount of
4  $100,000, aligns with typical recoveries for these types of agreements. (Doc. 30-1 at 60-61; *see*
5  *also* Doc. 34-1 at 6, ¶ 30 ("It is well-established that PAGA settlements, and even PAGA awards
6  after trial, are highly variable and routinely a fraction of the maximum theoretical civil penalty
7  amount because of the discretionary language in the PAGA statute.").) The $100,000 civil penalty
8  represents 4 percent of the $2,400,000 gross settlement fund. Pursuant to the PAGA, 75 percent
9  of the civil PAGA penalties ($75,000) will go to the LWDA, and 25 percent ($25,000) will
10 remain as part of the net settlement fund. (Doc. 30-1 at 60-61; *see* Cal. Lab. Code § 2699(i).) The
11 amount proposed to settle Plaintiffs' PAGA claims is consistent with other PAGA settlements
12 approved by this court. *See, e.g.*, *Syed v. M-I, LLC*, 2017 WL 714367, at *13 (E.D. Cal. Feb. 22,
13 2017) (2017 WL 3190341 (E.D. Cal. July 27, 2017) (granting final approval)) (approving
14 $100,000.00 in PAGA penalties for a California class with a $3,950,000 gross settlement fund).
15 The Court concludes that the settlement of Plaintiff's PAGA claims is fair, reasonable, and
16 adequate in light of the PAGA's public policy goals. *See O'Connor v. Uber Techs., Inc.*, 201 F.
17 Supp. 3d 1110, 1133 (N.D. Cal. 2016).

18       4.   Extent of Discovery Completed and Stage of the Proceedings

19       Approval of a class action settlement "is proper as long as discovery allowed the parties to
20 form a clear view of the strength and weaknesses of their case." *Monterrubio v. Best Buy Stores,*
21 *L.P.*, 291 F.R.D. 443, 454 (E.D. Cal. 2013); *see also Linney v. Cellular Alaska P'ship*, 151 F.3d
22 1234, 1239 (9th Cir. 1998) (citations and quotation marks omitted) ("In the context of class action
23 settlement, 'formal discovery is not a necessary ticket to the bargaining table' where the parties
24 have sufficient information to make an informed decision about settlement."). A settlement is
25 presumed fair if it "follow[s] sufficient discovery and genuine arms-length negotiation." *Adoma*
26 *v. Univ. of Phx., Inc.*, 913 F. Supp. 2d 964, 977 (E.D. Cal. 2012). The Court must consider
27 whether the process by which the parties arrived at their settlement is truly the product of arm's
28 length bargaining, rather than collusion or fraud. *Millan v. Cascade Water Servs., Inc.*, 310

1  F.R.D. 593, 613 (E.D. Cal. 2015).

2      The parties have conducted significant formal and informal discovery in this case.

3  Plaintiffs' counsel conducted an extensive investigation that provided much of the information

4  needed to evaluate their claims, such as the rates of pay, work assignments, locations where

5  employees worked, analysis of damages, etc. (Doc. 44 at 18-19.) The parties shared this

6  information through discovery requests and several mediation sessions. (*Id.*; Doc. 44-2 at 3, ¶ 7.)

7  The parties resolved substantive legal issues through motions practice and appellate review. (Doc.

8  44-2 at 10, ¶ 38.) Class counsel also affirmed that settlement negotiations have been non-

9  collusive, adversarial, and at arms'-length. (*Id.*) Accordingly, the stage of the proceedings and the

10  efforts expended during mediation and settlement negotiations to thoroughly advocate for their

11  respective clients supports a finding that the proposed settlement is fair, adequate, and reasonable.

12      5.  Experience and Views of Counsel

13      The representation for the class consists of Daniel J. Palay, Esq., Brian D. Helefinger,

14  Esq., and Michael A. Strauss, Esq. (Doc. 30 at 28.) These attorneys "have substantial experience

15  litigating and settling complex employment law actions involving the same issues raised by this

16  case." (Doc. 44 at 19.) For example, Michael Strauss has focused his practice on employment

17  litigation for the past ten years and served as class counsel in numerous cases involving similar

18  issues. (Doc. 44-1 at 4-5, ¶¶ 18-19.) The views of class counsel align with the Court's conclusions

19  regarding the strength and weaknesses of plaintiff's case and the risks and expenses associated

20  with prolonged litigation. (*See* Doc. 44 at 19-20.) Accordingly, these factors weigh in favor of

21  finding the settlement has fundamental fairness.

22      6.  Presence of a Governmental Participant

23      Although there is no governmental participant in the action, the proposed settlement

24  provides relief to the California Labor & Workforce Development Agency under PAGA, in the

25  amount of $75,000. (Doc. 44 at 20; Doc. 30-1 at 60-61.) This too weighs in favor of settlement

26  approval. *See Adoma v. Univ. of Phx. Inc.*, 913 F. Supp. 2d 964, 977 (E.D. Cal. 2012); *Zamora v.*

27  *Ryder Integrated Logistics, Inc.*, 2014 WL 9872803, at *10 (S.D. Cal. Dec. 23, 2014) (factoring

28  civil PAGA penalties in favor of settlement approval).

1        7. <u>Reaction of Class Members to the Proposed Settlement</u>

2          The absence of objections to a proposed class action settlement supports the conclusion

3 that the settlement is fair, reasonable, and adequate. *See Nat'l Rural Telecomms.*, 221 F.R.D. at

4 529 ("The absence of a single objection to the Proposed Settlement provides further support for

5 final approval of the Proposed Settlement."); *see also Barcia v. Contain-A-Way, Inc.*, 2009 WL

6 587844, at *4 (S.D. Cal. Mar. 6, 2009). According to CPT Group, no member has objected to the

7 settlement and only one has submitted a timely request for exclusion. (Doc. 44-5 at 3, ¶¶ 12-13.)

8 Given the high participation rate from class members and the lack of any objections, the Court

9 finds this evidence supports settlement approval.

10        8. <u>Subtle Signs of Collusion</u>

11          The Court now considers whether any of the "more subtle signs" of collusion noted by the

12 Ninth Circuit are present here. *See In re Bluetooth*, 654 F.3d at 947. The requested amount for

13 attorneys' fees in this case raises some concern. The proposed settlement provides for an award of

14 up to 35 percent of the overall settlement amount. (Doc. 43 at 7.) This exceeds the Ninth Circuit's

15 benchmark for reasonable fee awards which is 25 percent. *See e.g.*, *Morales v. Stevco, Inc.*, 2011

16 WL 5511767, at *12 (E.D. Cal. Nov. 10, 2011) ("The typical range of acceptable attorneys' fees

17 in the Ninth Circuit is 20% to 33 1/3% of the total settlement value, with 25% considered the

18 benchmark."). The settlement agreement also includes a "clear sailing" provision, in which

19 Ensign agrees not to object to, oppose, or otherwise contest class counsel's award of attorneys'

20 fees or costs. (Doc. 30-1 at 79.) Though the "very existence of a clear sailing provision increases

21 the likelihood that class counsel will have bargained away something of value to the class," a

22 clear sailing provision is not necessarily fatal to final approval. *In re Bluetooth*, 654 F.3d at 948

23 (citation omitted); *but see Acosta v. Evergreen Moneysource Mortg. Co.*, 2019 WL 6051117, at

24 *13 (E.D. Cal. Nov. 15, 2019) ("Although defendant agreed not to oppose class counsel's request

25 for attorneys' fees, those fees will come from the settlement fund, mitigating the concern

26 regarding defendant's agreement.") Rather, "when confronted with a clear sailing provision, the

27 district court has a heightened duty to peer into the provision and scrutinize closely the

28 relationship between attorneys' fees and benefit to the class." *Id.* (citing *Staton*, 327 F.3d at 954).

1    Despite the high percentage fee award and the clear sailing provision, the settlement

2    acknowledges that the Court may reduce the fee award, and any attorney fees not awarded will

3    return to the class fund, not to Ensign. (Doc. 44 at 21.) Such non-reversionary provisions help

4    negate concerns of collusion because the benefits renown to the class members rather than the

5    defendant. *See Ross v. Bar None Enters.*, 2015 WL 1046117, at *10 (E.D. Cal. Mar. 10, 2015)

6    (approving a settlement agreement with a clear sailing provision but where any amount not

7    awarded in attorneys' fees reverts to the settlement class). Therefore, the proposed settlement

8    allows the Court to mitigate these concerns regarding the high attorneys' fee request.

9    In sum, the more subtle signs of collusion are not sufficiently present here to warrant the

10    Court rejecting the proposed settlement. On balance, the Court is satisfied that the settlement is

11    not the product of collusion, and therefore concludes that the settlement is fair, reasonable, and

12    adequate. *See* Fed. R. Civ. P. 23(e).

13    **IV.    ATTORNEYS' FEES, EXPENSES, AND INCENTIVE PAYMENTS**

14    **A.    Attorneys' Fees**

15    The Court has an "independent obligation to ensure that the award [of attorneys' fees],

16    like the settlement itself, is reasonable, even if the parties have already agreed to an amount." *In*

17    *re Bluetooth*, 654 F.3d at 941. This is because, when fees are paid from a common fund, the

18    relationship between the class members and class counsel becomes "adversarial." *In re Mercury*

19    *Interactive Corp. Secs. Litig.*, 618 F.3d 988, 994 (9th Cir. 2010); *In re Wash. Pub. Power Supply*

20    *Sys. Secs. Litig.*, 19 F.3d 1291, 1302 (9th Cir. 1994). As such, the district court assumes a

21    fiduciary role for the class members in evaluating a request for an award of attorneys' fees from

22    the common fund. *In re Mercury*, 618 F.3d at 994; *see also Rodriguez v. Disner*, 688 F.3d 645,

23    655 (9th Cir. 2012); *W. Publ'g Corp.*, 563 F.3d at 968.

24    The Ninth Circuit has approved two methods for determining attorneys' fees in cases

25    where the attorneys' fee award is taken from the common fund: the "percentage of the fund"

26    method and the "lodestar" method. *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Cir.

27    2002) (citation omitted). The district court retains discretion in common fund cases to choose

28    either method. *Id.*; *Vu v. Fashion Inst. of Design & Merch.*, 2016 WL 6211308, at *5 (C.D. Cal.

13

Mar. 22, 2016). Under either approach, "[r]easonableness is the goal, and mechanical or formulaic application of method, where it yields an unreasonable result, can be an abuse of discretion." *Fischel v. Equitable Life Assurance Soc'y of U.S.*, 307 F.3d 997, 1007 (9th Cir. 2002). The Ninth Circuit set a 25 percent benchmark for the award of attorneys' fees in common fund cases. *In re Bluetooth*, 654 F.3d at 942 ("[C]ourts typically calculate 25% of the fund as the 'benchmark' for a reasonable fee award, providing adequate explanation in the record of any 'special circumstances' justifying a departure."). Certain reasons may justify varying from the benchmark, such as when counsel achieves exceptional results for the class; undertakes "extremely risky" litigation; generates benefits for the class beyond simply the cash settlement fund; or handles the case on a contingency basis. *Vizcaino*, 290 F.3d at 1048-50; *see also In re Online DVD-Rental*, 779 F.3d at 954-55. Ultimately, however, "[s]election of the benchmark or any other rate must be supported by findings that take into account all of the circumstances of the case." *Vizcaino*, 290 F.3d at 1048.

When using the percentage method, the Court should apply a "lodestar cross-check" to help evaluate the reasonableness of a particular percentage recovery of a common fund. *Vizcaino*, 290 F.3d at 1050 ("Where such investment is minimal, as in the case of an early settlement, the lodestar calculation may convince a court that a lower percentage is reasonable. Similarly, the lodestar calculation can be helpful in suggesting a higher percentage when litigation has been protracted."); *see also In re Online DVD-Rental*, 779 F.3d at 955. The Court need not calculate a precise lodestar for purposes of the cross-check, but rather "may use a 'rough calculation.'" *Bond v. Ferguson Enters., Inc.*, 2011 WL 2648879, at *12 (E.D. Cal. June 30, 2011) (quoting *Fernandez v. Victoria Secret Stores, LLC*, 2008 WL 8150856, at *9 (C.D. Cal. July 21, 2008)). In addition to the baseline multiplication of a reasonable hourly rate by the number of hours worked, a lodestar multiplier may be applied. "Multipliers in the 3–4 range are common in lodestar awards for lengthy and complex class action litigation." *Van Vranken v. Atl. Richfield Co.*, 901 F. Supp. 294, 298 (N.D. Cal. 1995) (citing *Behrens v. Wometco Enters., Inc.*, 118 F.R.D. 534, 549 (S.D. Fla. 1988)); *see also* 4 NEWBERG ON CLASS ACTIONS § 14.7 (courts typically approve percentage awards based on lodestar cross-checks of 1.9 to 5.1 or even higher, and "the multiplier of 1.9 is

14

1    comparable to multipliers used by the courts"); *In re Prudential Ins. Co. Am. Sales Practice Litig.*

2    *Agent Actions*, 148 F.3d 283, 341 (3d Cir. 1998) ("[M]ultiples ranging from one to four are

3    frequently awarded in common fund cases when the lodestar method is applied.").

4         Class counsel requested an attorneys' fee award $840,000, which amounts to 35 percent of

5    the common fund. (Doc. 43 at 7.) Class counsel's request exceeds the Ninth Circuit's benchmark

6    by 10 percentage points. They argue this upward deviation is warranted because the results

7    obtained for the settlement class are excellent, the degree of risk in the litigation was very high,

8    class counsel are highly experienced and skilled, counsel spent over six years litigating this case,

9    and the reaction from the settlement class supports the request. (*Id.* at 10-15.) They further

10   contend the 35 percent request is in line with the market rate. (*Id.* at 13-15.)

11        The Court acknowledges that counsel expended significant effort in this matter over many

12   years and are highly experienced on the relevant issues. Counsel also achieved a substantial result

13   for the class despite new precedent which has undermined many of the original claims. However,

14   these circumstances do not support such an extensive departure from the benchmark. Class

15   counsel has not cited any case that suggests 35 percent fee awards are commonly approved. To

16   the contrary, this District regularly reduces fee requests that extensively deviate from the

17   benchmark. *See Castro v. Paragon Indus.*, 2021 WL 2042333, at **9-12 (E.D. Cal. May 21,

18   2021) (reducing counsel's requests for attorneys' fees of 35 percent to 27.5 percent); *Ferrell v.*

19   *Buckingham Prop. Mgmt.*, 2022 WL 224025, at**2-4 (E.D. Cal. Jan. 25, 2022) (reducing the

20   requested 35 percent to 25 percent benchmark despite 8 years of litigation).

21        Of the cases relied upon by Counsel, the highest percentage fee award approved by the

22   court was 33 percent of the overall settlement. For example, in *Boyd v. Bank of America*

23   *Corporation*, the court awarded the requested 33 percent of the settlement in part because counsel

24   had spent more than 3,000 hours litigating the case and the settlement included continuing

25   benefits for class members after the initial settlement distribution. 2014 WL 6473804, at *8, 10-

26   12 (C.D. Cal. Nov. 18, 2014); *see also Vandervort v. Balboa Capital Corp.*, 8 F. Supp. 3d 1200,

27   1208-10 (C.D. Cal. 2014) (awarding 33 percent of settlement where the attorneys spent more than

28   1,100 hours litigating the case and achieved a favorable result despite presenting an issue of first

impression). Though class counsel here achieved a favorable result despite meritorious defenses, which could have undermined the merits of their claims, counsel only spent approximately 600 to 700 hours on this matter, falling well below the cited authority. (Doc. 43 at 16.) Additionally, in both *Boyd* and *Vandervort*, the court highlighted the unique and unlikely results achieved for the class. *Boyd*, 2014 WL 6473804, at *9; *Vandervort*, 8 F. Supp. 3d at 1209. Here, class counsel certainly achieved a favorable result despite intervening and adverse precedent, but there is no evidence to suggest the settlement award exceeded a typical award in these cases. (*See* Doc. 43 at 10.) Thus, the circumstances of this case do not support such an extensive deviation from the benchmark.

The lodestar cross-check further supports the Court's determination that the requested 35 percent is not warranted. The Court has reviewed the billing records attached to the fee request and finds the total and individual entries for the work completed are reasonable. (*See* Doc. 43-1 at 17-27); *see also Chalmers v. City of Los Angeles*, 796 F.2d 1205, 1210-11 (9th Cir. 1986) ("In determining reasonable hours, counsel bears the burden of submitting detailed time records justifying the hours claimed to have been expended.") In addition, the billable rate for each attorney who worked on this matter aligns with the Laffey matrix for attorneys of similar experience. (*See* Doc. 43 at 16; Doc. 43-1 at 31.) Therefore, the Court also finds the billable rates are appropriate. *Chalmers*, 796 F.2d at 1210-11 ("In determining a reasonable hourly rate, the district court should be guided by the rate prevailing in the community for similar work performed by attorneys of comparable skill, experience, and reputation"). Accordingly, the total actual fees in this case amount to approximately $426,527.50. (Doc. 44 at 29.)

To reach the requested $840,000, the Court would have to apply a multiplier of 1.97. (Doc. 44 at 29.) Although this multiplier falls squarely within the normal range of multipliers in similar cases (*see Van Vranken*, 901 F. Supp. at 298), class counsel has not cited, and the Court has not found, any case where a multiplier of 1.97 or higher was approved to support a 35 percent fee award. *See e.g.*, *Vizcaino*, 290 F.3d at 1051 (applying a lodestar multiplier of 3.65 to support a 28 percent fee award); *see also Steiner v. Am. Broad.Co.*, 248 Fed. App'x 780, 783 (9th Cir. 2007) (applying a lodestar multiplier of 6.85 to support a 25 percent fee award); *Wilson v. Metals*

1   *USA, Inc.*, 2021 WL 516585, at \*8 (E.D. Cal. Feb. 11, 2021) (allowing a 1.2 lodestar multiplier to

2   support a 35.1 percent fee award but applying minor reductions to the overall amount given errors

3   in the hourly rate).

4          The Court recognizes that contingency-based law firms need to recover more than their

5   actual expended hours in cases they win to offset cases with no recovery. However, 35 percent

6   reaches the upper end of the spectrum of reasonable contingency based fees and far exceeds the

7   Ninth Circuit's 25 percent benchmark. Plaintiffs cited two cases with similar percentage fees and

8   lodestar multipliers, but both cases involved a lower percentage than that requested here. *See*

9   *Boyd*, 2014 WL 6473804, at \*11-12 (applying a 2.58 lodestar multiplier to reach 33 percent of

10  settlement amount); *Vandervort*, 8 F. Supp. 3d at 1210 (applying a 2.52 lodestar multiplier to

11  reach a 33 percent). Moreover, as explain above, in these cases, the attorneys expended in excess

12  of a thousand hours on the case and the settlements had exceptional benefits to the class,

13  warranting the upward departure. Even still, the percentage requested and awarded was 33

14  percent not 35 percent. The Court finds, in its discretion, 35 percent and a 1.97 multiplier exceed

15  the typical award for similar cases. The Court, therefore, will reduce the attorneys' fee award to

16  30 percent of the total settlement (i.e., $720,000), to align this case with the established precedent.

17  **B.      Litigation Expenses of Class Counsel**

18         Class counsel also seeks to recover the costs expended on this litigation. Expense awards

19  "should be limited to typical out-of-pocket expenses that are charged to a fee paying client and

20  should be reasonable and necessary." *In re Immune Response Secs. Litig.*, 497 F. Supp. 2d 1166,

21  1177 (S.D. Cal. 2007). This can include reimbursements for: "(1) meals, hotels, and

22  transportation; (2) photocopies; (3) postage, telephone, and fax; (4) filing fees; (5) messenger and

23  overnight delivery; (6) online legal research; (7) class action notices; (8) experts, consultants, and

24  investigators; and (9) mediation fees." *Id*.

25         Class counsel declares that his firm incurred $12,741.47 in costs related to this case. (Doc.

26  43-1 at 6, ¶ 18.) He attests that these costs were for mediation, attorney services, parking, court

27  filings, necessary transportation, delivery, and PAGA filing. (*Id.*) Class counsel submitted an

28  itemized list of these expenses. (*Id.*) The Court finds these expenses appropriate and will award

1    class counsel $12,741.47 in costs.

2    **C.     Incentive Payments**

3           Though incentive awards are "fairly typical in class action cases," they are discretionary

4    sums awarded by the court "to compensate class representatives for work done on behalf of the

5    class, to make up for financial or reputational risk undertaken in bringing the action, and,

6    sometimes, to recognize their willingness to act as a private attorney general." *W. Publ'g Corp.*,

7    563 F.3d at 958-59; *Staton*, 327 F.3d at 977 ("[N]amed plaintiffs . . . are eligible for reasonable

8    incentive payments."). Such payments are to be evaluated individually and should look to factors

9    such as "the actions the plaintiff has taken to protect the interests of the class, the degree to which

10   the class has benefitted from those actions, . . . the amount of time and effort the plaintiff

11   expended in pursuing the litigation . . . and reasonabl[e] fear[s of] workplace retaliation." *Staton*,

12   327 F.3d at 977 (internal quotations omitted) (alteration in original).

13          The named plaintiffs request incentive payments in the amount of $35,000 and $25,000

14   for Newell and Calderon, respectively. (Doc. 44 at 29.) The average payment to class members

15   will be $4,028.62 (and FLSA average payments of $1,135.34), with individual payments

16   determined based on the class member's pro rata share of the total hours applicable to the

17   settlement. (Doc. 30 at 16; Doc. 44-5 at 3-4.) Newell's incentive award represents approximately

18   8.7 times the average class member payment. Calderon's award represents approximately 6.2

19   times the average. Courts in this circuit have previously approved similar incentive awards with

20   even greater incentive payments relative to the average member award; therefore, the Court finds

21   that the awards are "not outside the realm of what has been approved as reasonable by other

22   courts." *Aguilar v. Wawona Frozen Foods*, 2017 WL 2214936, at *8 (E.D. Cal. May 19, 2017)

23   (approving an incentive award of $7,500 to each class representative where average class

24   recovery was approximately $500); *see also Davis v. Brown Shoe Co., Inc.*, 2015 WL 6697929, at

25   **5, 12 (E.D. Cal. Nov. 3, 2015) (approving $7,000 incentive award where average class

26   recovery was approximately $400). Furthermore, as the noted in the Court's order granting

27   preliminary settlement approval, the named plaintiffs have faced significant risks serving as class

28   representatives and spent between 150 and 275 hours working on this case. (Doc. 38 at 28-29.)

1    The Court finds the incentive payments are fair and do not negate the adequacy of class

2    representation in this case.

3                    **V.    APPROVAL OF FLSA SETTLEMENT**

4            The complaint in this action contains claims brought under the FLSA. Settlement of

5    collective action claims under the FLSA requires court approval. *See Jones v. Agilysys, Inc.*, 2014

6    WL 108420, at *2 (N.D. Cal. Jan. 10, 2014). "The FLSA establishes federal minimum-wage,

7    maximum-hour, and overtime guarantees that cannot be modified by contract." *Genesis*

8    *Healthcare Corp. v. Symczyk*, 569 U.S. 66, 69 (2013). Because an employee cannot waive claims

9    under the FLSA, they may not be settled without supervision of either the Secretary of Labor or a

10   district court. *See Barrentine v. Ark.–Best Freight Sys., Inc.*, 450 U.S. 728, 740, n.16 (1981); *Yue*

11   *Zhou v. Wang's Rest.*, 2007 WL 2298046, at *1 (N.D. Cal. Aug. 8, 2007).

12           The Ninth Circuit has not established criteria for district courts to consider in determining

13   whether an FLSA settlement should be approved. *See Dunn v. Teachers Ins. & Annuity Ass'n of*

14   *Am.*, 2016 WL 153266, at *3 (N.D. Cal. Jan. 13, 2016). However, in this circuit, district courts

15   have normally applied a widely used standard adopted by the Eleventh Circuit, which considers

16   whether the settlement is a fair and reasonable resolution of a bona fide dispute. *Id.*; *see also*

17   *Lynn's Food Stores, Inc. v. United States*, 679 F.2d 1350, 1352-55 (11th Cir. 1982); *Selk v.*

18   *Pioneers Mem'l Healthcare Dist.*, 159 F. Supp. 3d 1164, 1172 (S.D. Cal. 2016); *Yue Zhou*, 2007

19   WL 2298046, at *1. "A bona fide dispute exists when there are legitimate questions about the

20   existence and extent of Defendant's FLSA liability." *Selk*, 159 F. Supp. 3d at 1172 (internal

21   quotation marks and citation omitted). A court will not approve a settlement of an action in which

22   there is certainty that the FLSA entitles plaintiffs to the compensation they seek, because it would

23   shield employers from the full cost of complying with the statute. *Id.*

24           Once it is established that there is a bona fide dispute, courts often apply the Rule 23

25   factors for assessing proposed settlements and evaluating the fairness of an FLSA settlement,

26   "while recognizing that some of those factors do not apply because of the inherent differences

27   between class actions and FLSA actions." *Khanna*, 2014 WL 1379861, at *2 (internal quotations

28   omitted). Having found this settlement to be fair and reasonable under Rule 23, the Court

1    therefore looks only to whether bona fide dispute exists about the likelihood and extent of

2    defendants' FLSA liability. As explained more fully in the order granting preliminary approval,

3    the parties have at least four areas of dispute regarding the FLSA claims. (Doc. 38 at 19-21.)

4    First, Plaintiffs assert Ensign failed to account for lodging and meal benefits in the rate of regular

5    and overtime pay, as required under the FLSA. (Doc. 34 at 19.) Ensign disputes whether these

6    benefits must be accounted for in the overtime rate. (*Id.*) Second, the parties dispute the period

7    attached to the alleged violations because Ensign contends any such violation was not willful. (*Id.*

8    at 20.) Third, even if the meal and lodging should have been included in the regular and overtime

9    rate, Ensigns contends that any wages owed are offset by the overtime and double time rates paid.

10   (*Id.* at 20-21.) Fourth, the parties dispute whether arbitration agreements preclude certain

11   employees from relief under FLSA. (*Id.* at 21-22.) Accordingly, the Court concludes there is a

12   bona fide dispute as to FLSA liability and will approve the FLSA settlement.

13                          **VI.     CONCLUSION AND ORDER**

14       For the reasons stated above,

15       1.    Plaintiffs' motion for final approval of the class action and collective action

16             settlement (Doc. 44) is **GRANTED**; the settlement class is **CERTIFIED**; the

17             Court **APPROVES** the settlement as fair, reasonable, and adequate; and incentive

18             payments to the class representatives are **GRANTED**.

19       2.    Louis Newell and Miguell Calderon are confirmed as class representatives;

20             attorneys Daniel J. Palay, Esq., and Brian D. Hefelfinger, Esq. of Palay

21             Hefelfinger, APC and Michael A. Strauss of Strauss & Strauss APC are confirmed

22             as class counsel, and CPT Group, Inc. is confirmed as the claims administrator.

23       3.    Plaintiffs' motion for attorneys' fees (Doc. 43) is **GRANTED IN PART**, and the

24             Court awards $720,000 in attorneys' fees and $12,741.47 in costs.

25   ///

26   ///

27   ///

28   ///

4.      The Clerk of Court is directed to close this case.

IT IS SO ORDERED.

Dated:   __**July 12, 2022**__

UNITED STATES DISTRICT JUDGE